**H. LUBOVSKY, INC., Plaintiff,**

**v.**

**ESPRIT DE CORP., Defendant.**

**No. 81 Civ. 2161 (PNL).**

United States District Court,
S.D. New York.

Jan. 22, 1986.

As Amended Jan. 28, 1986.

Boris Haskell, Paris & Haskell, Washington, D.C., for plaintiff.

Fredric W. Yerman, Randolph S. Sherman, Richard A. DeSevo, Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

This is a trademark infringement action pursuant to the Lanham Act § 32 et seq., 15 U.S.C. § 1114 et seq. Plaintiff, H. Lubovsky, Inc., the owner of the mark *ESPRIT* for women's shoes, sues for damages and for an injunction barring defendant Esprit de Corp., from using *Esprit* and *Esprit de Corp* as marks on the defendant's clothing, accessories and shoes.

### A. *History*

#### 1. *Plaintiff.*

Plaintiff is a small importer and wholesale distributor of women's shoes. Its staff consists of two full-time and two part-time employees and eight commission salespeople. Its annual sales have ranged from a low of $692,000 in 1963 to a high of $3,318,000 in 1978. For the year ending June 30, 1983, sales were $1.8 million and for 1984, $2.4 million. Plaintiff markets its shoes nationwide, primarily through sales representatives and by showings at national and regional shoe shows.

On March 1, 1963, plaintiff adopted the label *Esprit.* On March 3, 1964, it obtained a federal trademark registration of *Esprit* for women's shoes (registration no. 765,-974). Since that time, plaintiff has continuously used *Esprit* as one of its trademarks. Plaintiff also markets its shoes under the trademark *Robertina.* For many of its larger customers, plaintiff does not use *Robertina* or *Esprit* but has the shoes made up showing the customer's in-house brand.

Plaintiff displays the *Esprit* logo on the sock lining of *Esprit* shoes and on the shoe boxes. Beyond this, however, plaintiff does practically nothing to promote or publicize the *Esprit* mark. It does virtually no advertising. Its promotion expenses have slightly exceeded a total of $100,000 over twenty-two years, most of which has been spent entertaining buyers.

Plaintiff's *Esprit* mark, so far as the evidence shows, commands virtually no public recognition. Consumers who buy plaintiff's shoes do not ask for them by the *Esprit* name. And buyers who place orders with plaintiff for stock rarely specify that the merchandise should bear the *Esprit* label.

Although plaintiff's catalogue shows a variety of styles and types of shoes, it appears that the vast majority of its sales are of traditional, dressy, high-heeled shoes with pointed toe.

Plaintiff's business is exclusively limited to women's shoes, as is its *Esprit* mark registration. Except for a foray several years ago into women's handbags and hats (which bore no trademarks), plaintiff has marketed only women's shoes since its business began thirty-seven years ago and it has no plans to expand beyond that area in the future.

#### 2. *Defendant.*

Defendant, Esprit de Corp designs and markets sportswear, primarily women's and children's. Its merchandise is de-

scribed as imaginative, trendy, forward fashion or avant-garde, appealing to a youthful, active, sporty clientele. It has been enormously successful, with sales increasing from $17.6 million in 1975, to $43.1 million in 1980 and to $211 million in 1984 (stip. facts pp. 18–19).

Defendant's business began in 1968 under the name "Plain Jane"; in 1970 it incorporated and adopted its present name "Esprit de Corp." During the following decade, defendant marketed its women's sportswear under a variety of "divisional" trademarks and labels including, *Plain Jane, Sweet Baby Jane, Cecily, In Good Hands, Jasmine Teas, Esprit's Chemise,* and *Rose Hips.* Around 1976, it began to use the mark *Esprit* on some of its merchandise. In 1978, to promote a distinctive unified image, the company began a trademark unification program aimed toward marketing under the single name *Esprit.* As part of the change a new *Esprit* logo was designed, using modern stencil block print and an E consisting of triple horizontal bars without the vertical staff. To preserve the goodwill established under the seven original divisional trademarks, defendant decided to make the transition gradually. Beginning in the 1979 holiday season, defendant added to its hangtags and labels the new *Esprit* logo under each of the seven divisional names, *e.g., Plain Jane/Esprit, In Good Hands/Esprit,* etc. The *Esprit* logo captioned defendant's catalogues and advertisements. It was planned that as the second stage, *Esprit* would go into the dominant position, above the old trademarks, and finally that the old trademarks would be dropped, leaving *Esprit* alone to identify all defendant's merchandise.

On November 13, 1978, defendant had filed an application to register the mark *Esprit* for clothing. The application was rejected by the trademark office on December 5, 1979 by reason of plaintiff's previously registered *Esprit* mark for women's shoes. Up to this point, defendant had never heard of plaintiff's *Esprit* mark. It had sold already approximately $13 million of merchandise under the *Esprit* mark.

Defendant then took steps to learn whether plaintiff was using the *Esprit* mark and learned that it was. Defendant's investigations showed four users of *Esprit* as a mark for clothing and accessories— plaintiff (for shoes), Mistee Lingerie, Inc. (for lingerie), Fuqua Cycle Corp. (for motorcycle boots, gloves and accessories) and Campus (for men's clothing). In addition, an H.D. Lee Co. had used Esprit de Corps for wearing apparel.

In part because of the weakness of the mark, the number of users, the time during which defendant had already used *Esprit* and *Esprit de Corp* in its business, and the distance between shoes and clothes, defendant's trademark attorney advised that plaintiff's exclusive rights for women's shoes should not bar defendant from use of the *Esprit* mark on clothing. He counseled, however, that *Esprit* not be used for the sale or advertising of shoes and that shoes not be offered through defendant's *Esprit* mail order catalogues. Defendant, meanwhile, submitted a new application for registration, now based on the new stylized logo, which also was eventually rejected. The application did not include shoes or accessories.

Defendant meanwhile proceeded with its program of trademark unification. Having begun in 1979 to put "Esprit" below its various divisional marks, in 1981, defendant reversed the order placing *Esprit* above the divisional names. Then in 1982, the old divisional names were dropped leaving the name *Esprit* alone.

From 1979 to 1984, defendant spent $20 million advertising its fashion under the *Esprit* mark. Its advertisements appeared in all the major fashion magazines. In addition, it distributed 15 million mail order catalogues under the *Esprit* name.

Notwithstanding the advice of its attorney, defendant used the *Esprit* mark for shoes, in combination with its divisional mark "In Good Hands." After plaintiff brought this action, defendant began to mark its shoes *In Good Hands/Esprit de Corp* and later, in 1983, *Esprit de Corp.*

Throughout, however, contrary to its counsel's advice, defendant marketed shoes in its mail order catalogues which featured the name *Esprit* prominently on the covers and throughout. (In tiny print inconspicuously placed on a page offering shoes, defendant places a legend "Footwear by Esprit de Corp.")

Also, in 1984, defendant began to sell its merchandise in its own Esprit retail stores. As to shoes sold in those stores, although the sock linings and the shoe boxes say "Esprit de Corp.," the shoes are nonetheless sold there under the *Esprit* mark in the sense that this mark dominates the store, and appears to cover all the merchandise.

Defendant's sales of shoes have grown enormously. In 1983, defendant established the Esprit de Corp. shoe division and invested heavily in it. In 1983, shoe sales reached $3.3 million which exceeded the three prior years combined. In 1985, shoe sales have run at a rate of $1.3 million per month.

In January 1981, defendant made an offer to plaintiff to buy plaintiff's *Esprit* mark, which was refused. While its second application for registration was pending, defendant negotiated to buy Mistee Lingerie's mark from its new owner. Mistee had used *Esprit* since 1946 but had ceased to use it in July 1978 when its assets were sold off during a Chapter XI proceeding. Defendant's purchase was concluded in 1981, a day before defendant received notification of the rejection of the second application (which was based in part on Mistee's registration). Defendant then sought reconsideration, bringing this acquisition to the examiner's attention.

In October 1982, the reconsideration was put on suspense pending termination of this suit. The trademark examiner indicated that he would have been inclined to publish the *Esprit* mark *for clothing* but for the pendency of this action (DX–403, pp 21–22). One year later, in November 1983, defendant's application was removed from suspense and the *Esprit* mark was published for *clothing* only. The examiner indi-

cated that plaintiff's *Esprit* registration for shoes "stands as no bar to the registrability of applicant's [Esprit] mark [for clothing]" (DX–403, pp 35–36). He further indicated that his decision to pass defendant's requested mark to publication was, among other factors, based on the fact that "registrant's goods are shoes, applicant's goods contain no footwear items" (DX–403, pp 35–36).

The Trademark Office then officially issued a *notice of publication* which stated that defendant's mark *for clothing* "appears to be entitled to registration" and accordingly "[t]he mark will ... be published in the Official Gazette ... for the purpose of opposition by any person who believes he will be damaged by the registration of the mark" (DX–403 p. 48). Plaintiff opposed the registration and an opposition proceeding was scheduled. The proceeding has been suspended by stipulation of the parties, pending the outcome of this suit.

### B. *Discussion*

I find that, as to defendant's lines of clothing, plaintiff has failed to make out a cause of action. As to defendant's sale of shoes, on the other hand, plaintiff has shown infringement and is entitled to relief.

### 1. *Defendant's Clothing Lines*

■ Plaintiff has failed to show entitlement to relief resulting from defendant's use of the *Esprit* mark on clothing.

A long and consistent line of cases in this Circuit starting with Judge Friendly's powerful opinion in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961), directs that analysis of this issue proceed with attention to a spectrum of relevant factors, as follows:

(a) *Strength of plaintiff's mark.* The "strength" of a mark implies its capacity, either inherent or acquired, to designate a source of the product. The strength of a mark is directly related to likelihood of confusion, for the stronger the mark, the more likely that the consumer will associ-

ate it with the familiar purveyor. For example, if a customer saw a doll in a toy store bearing a strong familiar trademark like "Exxon," he might well assume that the oil company had gone into the toy business; if, on the other hand, he saw a doll bearing a familiar but weak laudatory trademark like Merit, he would be unlikely to assume that it is connected with the similarly named gasoline or cigarettes.

■ (i) *Inherent Strength.* On the four-tier scale of trademark vitality, ranging from the unprotectible *generic* to the strongest *arbitrary* or *fanciful* marks, *Esprit* is not of particularly impressive strength. *See Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999 (2d Cir. 1983); *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9–11 (2d Cir. 1976); *Procter & Gamble Co. v. Johnson & Johnson Inc.,* 485 F.Supp. 1185, 1196 (S.D.N.Y.1979), *aff'd,* 636 F.2d 1203 (2d Cir. 1980). The word, although of French origin, has become an accepted part of the English language signifying vivacity or liveliness.[1] As a mark, it seeks to suggest lively, colorful attributes. It is a type of laudatory mark. When a merchant adopts a laudatory claim as his mark, he gives up the inherent strength that is commanded by arbitrary or fanciful marks, in favor of this advertising message.[2] *See Supreme Wine Co. v. American Distilling Co.,* 310 F.2d 888 (2d Cir.1960); *Procter & Gamble Co., supra* at 1196; *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403 (S.D.N.Y.1974).

■ (ii) *Strength derived from exploitation.* A related issue to the inherent strength of a mark is market strength derived from the user's exploitation of the mark in the marketplace. Even a mark which is low on the scale of inherent value

can acquire a high capacity to identify the purveyor to the consuming public. Such acquired strength, known as "secondary meaning," receives recognition in law. For example, it can render protectible an otherwise unprotectible descriptive mark. *See Thompson Medical Co. Inc. v. Pfizer,* 753 F.2d 208, 217–18 (2d Cir.1985); *Procter & Gamble Co., supra,* 485 F.Supp. at 1196; *Mushroom Makers, Inc.,* 441 F.Supp. 1220, 1226 n. 25 (S.D.N.Y.1977).

Although plaintiff has sold shoes under the *Esprit* label since March 1, 1963, it has made no showing that its mark has built up any significant consumer recognition. Plaintiff has never advertised its mark to the consumer. Its meager promotional expenditures have consisted almost entirely of entertaining store buyers. One of plaintiff's sales representatives (Orent) testified to plaintiff's failure to promote the mark. (Orent Dep. pp 103–04.) There is little indication that retail consumers ever asked for plaintiff's shoes by the Esprit name. Indeed, the orders of merchants placed with plaintiff rarely specified that they wished merchandise bearing the *Esprit* label. A large portion of plaintiff's retail customers had their merchandise made up with their own in-house labels. Also, much of plaintiff's merchandise carried plaintiff's *Robertina* label, rather than *Esprit.* Plaintiff kept no records and offered no reliable evidence showing how much of its merchandise carried the *Esprit* label.

The weakness of *Esprit* as a mark is confirmed by the trademark register and other evidence that a number of unconnected entities have used "esprit" as a mark on wearing apparel. *See Lever Brothers Co. v. American Bakeries Co.,* 693 F.2d 251, 256 (2d Cir.1982) (the strength of even an

---

**1.** *Webster's Third New International Dictionary* (3d ed. 1976) defines esprit as "cleverness and vivacity (as of spirit and mind); sprightly wit, an inherent and native lively and colorful quality."

**2.** Plaintiff contends its mark is fanciful and in the highest protectible category. Defendant disputes this, contending, correctly in my view, that the mark is not strong. For obvious rea-

sons, however, with an eye to the future, defendant does not contend the mark is so weak as to belong in the descriptive category. As I have not had both sides of the issue presented to me, I make no ruling as to where the mark stands, beyond ruling that it falls distinctly below the arbitrary or fanciful category claimed by plaintiff.

arbitrary mark may be diluted by third-party use).

In short, plaintiff failed to show that its *Esprit* mark commanded any attention in the marketplace, that consumers were aware of the mark or identified it with plaintiff as supplier. I find that plaintiff's sales would not be significantly affected if it ceased using the *Esprit* label.

(b) *Degree of Similarity between Plaintiff's and Defendant's marks.* Although plaintiff and defendant use the same word as a mark, there are differences of presentation, of merchandise (shoes/clothes), of style, of clientele, of marketplace and of image which effectively diminish likelihood of confusion. *See Lever Brothers Co. v. American Bakeries, supra,* 693 F.2d at 257 ("close similarity between two marks is not dispositive of the issue of likelihood of confusion", other factors such as clientele and presentation must also be considered).

The marks are presented in quite different logos. *McGregor-Doninger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1133–34 (2d Cir.1979) ([l]ikelihood of confusion may be significantly reduced by the "alteration, addition or elimination of only two single letters from the mark"). Plaintiff, consistent with the traditional nature and appeal of its product, presents its *Esprit* logo in a stylized, semi-script that seeks to suggest the calligraphy of traditional high-fashion design:

## *Esprit*

Defendant's logo is in modern broken stencil block print, the E represented by three parallel bars, lacking the linking staff.

## ЕSPRIT

These logos present very different images.

Plaintiff argues that its ownership of the mark does not limit it to use the form of logo it has used for twenty years. This is true, but it misses the point of the purpose of the inquiry, which is to determine the likelihood of consumer confusion.

(c) *Proximity of Products.* Without doubt there is proximity between women's shoes and women's sportswear, which was recognized in *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 612 (2d Cir. 1960) and *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47–48 (2d Cir. 1978). The proximity creates some likelihood of customer confusion.

On the other hand, there is also an appreciable distance between plaintiff's shoes and defendant's clothing which diminishes the likelihood of confusion. Shoes are generally sold in shoe stores or shoe departments of department stores. Most frequently, therefore, they are either in a different store, or a different department, from sportswear. Plaintiff's and defendant's lines, furthermore, exhibit quite different styles, aiming at different clienteles. The retail customers for plaintiff's shoes are primarily women seeking traditional, dressy styles.[3] Defendant's merchandise aims at a youthful active modern sporty clientele. Plaintiff points to only ten stores that currently carry merchandise of both plaintiff and defendant. It is not shown, moreover, how many of those stores carry plaintiff's Esprit label.[4] Indeed, it appears that plaintiff's larger customers carry plaintiff's merchandise under their own in-house label, *i.e.,* without exhibiting plaintiff's *Esprit* mark.

There has been no showing of any customer overlap.

(d) *Sophistication of Buyers.* The sophistication-of-buyers factor reflects the concern that uninformed consumers might buy a junior trademark user's merchandise believing it to be that of the senior, or might blame the senior for quality deficiencies in the junior's products. There was little evidence on the subject of sophistication. There was showing that defendant's

---

3. Although some of plaintiff's catalogues have exhibited less formal styles, *see, e.g.,* PX–28, Nos. 4, 19, 26; PX–37 Nos. 3, 5, 6, 8, 12, 15, 16, 24, 29, 38, 46, the testimony of plaintiff's salesmen and customers shows that the vast majority of plaintiff's sales is in dressier shoes. *See, e.g.,* Orent Dep., pp 80, 94; Victor Dep., pp 17–18, 20.

4. Plaintiff points to 29 stores that have at some time carried plaintiff's and defendant's merchandise, not necessarily simultaneously, again without showing that such stores carried plaintiff's *Esprit* label.

mark is widely recognized and that plaintiff's has virtually no recognition.

Because defendant's line and mark are famous and plaintiff's are not, there was some showing that on first seeing, or hearing of, plaintiff's shoes, some wondered whether this was defendant's merchandise. (*See, e.g.,* Evans Dep. pp 13–14, 25–26; Fausone Dep. pp 27–30.) There is no evidence that any such confusion was more than momentary. Nor is there evidence that any potential customers for defendant's merchandise ever believed that it came from plaintiff.

As noted above, it was not shown that the customers for plaintiff's shoes have formed any attachment to plaintiff's *Esprit* brand. It does not play a significant role in plaintiff's sales. Plaintiff's customers are shoe stores (or shoe departments) that buy plaintiff's merchandise because it is suitable for sale to their customers. Plaintiff's retail purchasers, it appears, are the customers of the shoe stores who are shown plaintiff's shoes and find them satisfactory.

(e) *Bridging the Gap.* Where the junior user applies its mark to products different from those of the senior user, this *Polaroid* factor requires investigation into whether the senior user is likely to "bridge the gap" by expanding into the product lines being marketed by the junior. *See Lever Brothers Co., supra,* 693 F.2d at 258; *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655 (2d Cir. 1979). There is no such likelihood in this case. Plaintiff has no plans to expand into clothing, and no experience in that area.

(f) *The Quality of Defendant's Products.* This factor "reflects the law's recognition that a prior owner should not be subjected to the risk that the public perception of his product will suffer if it is associated with a product of inferior quality." *Procter & Gamble, supra,* 485 F.Supp. at 1202. There is no showing that any quality deficiency in defendant's products poses a risk to plaintiff's reputation. Defendant's lines have been extraordinarily successful in the marketplace. Its sales have grown tremendously over four years. This experience shows a huge and growing consumer demand for defendant's products. There is no evidence of consumer dissatisfaction with defendant's merchandise. *See Lever Brothers Co., supra,* 693 F.2d at 258; *Mushroom Makers, Inc., supra,* 441 F.Supp. at 1228.

Plaintiff makes a related argument that vulgarity and bad taste in defendant's advertising create an adverse public reaction to the Esprit mark. Plaintiff overstates and fails to prove this claim. The claim is addressed particularly to a small number of defendant's ads and catalogue illustrations that show young men and women in a manner suggesting sexual freedom. Plaintiff offered the testimony of a young woman lawyer who shares office space with plaintiff's counsel. She testified that she found the ads repugnant both because of their sexual suggestiveness and because she considered them to demean women. Also, plaintiff offered evidence that one day in 1981 a handful of women organized as *Women Against Violence and Pornography in the Media* picketed the defendant's place of business in San Francisco protesting one such ad on the grounds that it demeaned women.

The claim fails for numerous reasons. First, plaintiff has failed to establish that the ads are offensive to the average consumer or to any substantial segment of the marketplace. The fact that the young woman who shares office space with plaintiff's counsel finds them offensive hardly establishes that they are offensive to the average consumer. Nor does the fact that on one day in 1981 a protest organization mustered a dozen women to protest an ad. One thing clearly demonstrated by defendant's extraordinary success is that they must be doing something right. There was testimony from persons in the merchandising industry, including a buyer who stocks plaintiff's line called as a plaintiff's witness, as to how appealing and imaginative defendant's advertising is.[5] Furthermore,

**5.** Plaintiff's witness Carol Turner, a shoe seller, found defendant's ads "beautiful" (Dep., p. 8);

the same prominent fashion magazines in which the defendant's allegedly offensive ad was placed also contained numerous other ads by leading producers of fashion and beauty products which were also found "offensive" by plaintiff's witness for similar reasons. It seems clear that her opinions are not representative.

In a case of trademark confusion, it should not be necessary for the plaintiff to prove that the defendant's ads are offensive to the *general public* if it proved that the ads were offensive to *its* customers and that the confusion caused adverse reactions to plaintiff among those customers. But plaintiff also has failed to show that.

(g) *Actual Confusion.* Plaintiff's evidence shows some instances in which the identity of the *Esprit* name has caused confusion. To the extent that these relate to defendant's sale of women's shoes, they are discussed below. As to defendant's clothing lines, the instances shown have been momentary and generally lacking in harm or prejudice to plaintiff's business.

The instances generally have involved persons who were familiar with defendant's lines wondering on seeing plaintiff's *Esprit* name listed at a trade show whether this was defendant's merchandise. In some cases, persons looking for defendant's merchandise were referred to or called plaintiff. Evans Dep. (shoe buyer, Fla. dep't store), pp 13–14, 26–29; Garber Dep. (shoe show manager/operator), pp 82, 115–17, 123–30; Garber Aff. at 2; Lubovsky Dep. (Vol. I) pp 82 and 89, (Vol. III) pp 104–114, (Vol. VI) pp 85–144. No instance is shown of anyone being drawn to defendant's mark and merchandise because they are looking for plaintiff's. Indeed, as noted above, it is not shown that customers sought out plaintiff's merchandise by reference to its *Esprit* mark, *see Programmed Tax Systems, Inc. v. Raython Co.*, 439 F.Supp. 1128 (S.D.N.Y.1977), nor that there was any customer dissatisfaction with defendant's merchandise affecting plaintiff's reputation.

Gail Miller, a sportswear buyer stated: "Every-

■ (h) *Defendant's Good or Bad Faith.* Plaintiff contends defendant acted in bad faith in adopting the *Esprit* mark with knowledge of plaintiff's registration and use of the same mark. Bad faith, if found, can be of considerable significance in trademark disputes, in which equitable considerations play an important role, particularly as to remedy. However, where by reason of such factors as weakness of mark, differences in mark and distance between products, there is no infringement, the question of defendant's good or bad faith loses importance. A malicious would-be-trespasser who enters what he believes to be his neighbor's land has nonetheless committed no trespass if it turns out the land he entered was open to the public. *See, People v. Jaffe*, 185 N.Y. 497, 78 N.E. 169 (1909); *People v. Teal*, 196 N.Y. 372, 89 N.E. 1086 (1909).

But, in any event, plaintiff's claims of bad faith as to defendant's marketing of clothes are not convincing. Defendant began using the *Esprit* mark in 1976 or earlier without awareness of plaintiff's rights. In 1979 it began using *Esprit* on all its merchandise. Defendant had sold some $13 million in merchandise bearing the *Esprit* mark without a ripple from the marketplace before it learned of plaintiff's mark through the December 5, 1979 trademark office rejection.

■ Indeed, even if defendant had earlier searched the trademark register and had found plaintiff's registration, this need not have altered defendant's plans to use *Esprit* on its clothing lines since plaintiff's registration was for women's shoes. "Plaintiff's registration of its ... mark for shoes does not carry any presumption of an exclusive right to use that mark on non-competing goods, such as the defendant's sportswear. Its registration is *prima facie* evidence of its exclusive right to use the mark only 'on the goods or services specified in the certificate.' 15 U.S.C.A. § 1115(a)." *Avon Shoe, supra* at 613 n. 7. Thus, even after the trademark office had refused to register defendant's mark by

one loves defendant's catalogues" (Dep., pp 8–9).

reason of plaintiff's registration, defendant continued to use Esprit on its clothing lines on the correct advice of its trademark counsel that such use would not violate plaintiff's rights. Although a junior user's awareness of the senior user's mark can, of course, be evidence of bad faith, it does not necessarily establish bad faith, even after trademark office rejection, if the junior reasonably believes his use does not infringe. *See Mushroom Makers, supra,* 441 F.Supp. at 1229–30 (no bad faith found despite two rejections of registration where plaintiff's registration did not extend to defendant's products). *See also Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d at 218; *McGregor-Doninger v. Drizzle, Inc., supra* at 1137; *Triumph Hosiery Mills, Inc. v. Triumph International Corp.,* 308 F.2d 196, 199 (2d Cir.1962). Nor does the junior user's attempt to purchase the senior's rights necessarily show bad faith. One can prefer to avoid problems, lawsuits and uncertainties, in spite of a good faith belief that one's actions are justified. *See Procter & Gamble, supra* at 1202.

Plaintiff argues, in addition, that defendant exhibited bad faith in dealing with the trademark office when it applied for reconsideration after the second rejection. Plaintiff contends that defendant concealed from the trademark examiner the fact that defendant sold shoes and concealed also the fact that the Mistee mark, whose first use predated plaintiff's, had been out of use for over two years before defendant acquired it. I find that these contentions have little importance in this litigation. The trademark office proceeding was stayed pending this litigation. It has had no effect on this case. Perhaps it would have been more forthright of defendant to disclose that defendant sold shoes and that the Mistee mark had been dormant for a period of time. I do not find that this constituted bad faith or that it has significance for this action. As to defendant's sale of shoes, the registration was not being sought for shoes. As to the possible abandonment of Mistee's mark during its insolvency, counsel had two legitimate ends to serve by pointing out the acquisition of the mark that were unaffected by the possibility of abandonment. First, Mistee's registration had been cited as a bar to defendant's registration. Second, counsel believed the acquisition of Mistee afforded a psychological reinforcement to his point that the rejection of defendant's application was inconsistent with the trademark office's prior position as between plaintiff's registration and Mistee's.

But in any event, the question whether defendant should have revealed additional facts to the trademark examiner in reviewing its application to register Esprit for clothing has no bearing on whether defendant's use of Esprit for clothing infringed plaintiff's shoe mark. *See Avon Shoe Co., supra,* 279 F.2d at 613 n. 8; *Mushroom Makers, Inc., supra,* 441 F.Supp. at 1230 n. 42.

*Relative Harm to the Parties from Grant or Denial of a Remedy.*

Where an injunction is sought, courts give considerable weight to a balancing of the relative harm resulting from its grant or denial on the respective parties. *See Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 536 (2d Cir. 1964) (Friendly, J.); *Avon Shoe Co., supra,* 279 F.2d at 613 ("balancing the *conflicting interests* both parties have in the unimpaired continuation of their trademark use"). The factor of relative harm is easy to assess. Plaintiff is not shown to have developed any significant goodwill in the *Esprit* mark. Although plaintiff has placed the *Esprit* mark on some of its shoes for many years, it has never advertised the mark and has not built up any customer recognition of the mark. There is no showing that its sales would be affected if tomorrow it began using a different mark in its place.

In the defendant's case, loss of the *Esprit* mark would be catastrophic. Defendant's sales growth of 500% over five years to a volume exceeding $200 million has been directly related to its very successful promotion of its *Esprit* mark in connection with its merchandise. There is a huge

consumer demand for the defendant's *Esprit* trademark. Indeed, defendant's clothing often displays the *Esprit* logo in large letters as part of the design of the clothing. There can be no doubt that the trademark, as developed by defendant, contributes enormously to its sales.

*Likelihood of Confusion—Infringement—Relief*

Although, no doubt, a possibility of confusion arises when the same word is used as a mark for both women's shoes and women's sportswear, see *Avon Shoe, supra,* at 612; *Mushroom Makers, supra,* 580 F.2d 44, 47–48; the likelihood of such confusion in this case is relatively small for the many reasons mentioned above in the discussion of the *Polaroid* factors.

Furthermore, any confusion that may occur here is not damaging to plaintiff and is not of the sort that involves the harms with which the trademark law usually concerns itself. Here, there has been no assumption on the part of consumers that the junior user's goods come from a well-known senior. That kind of confusion permits a junior encroacher to trade on the senior's reputation and threatens to weaken the public acceptance of the senior's mark if inferior products emanating from the junior are associated by the public with the senior. No such risks arise here.

In this case, it is the junior user which has won public acceptance of its mark. There is no risk that consumers will buy defendant's products because of plaintiff's reputation. Nor is there risk of damage to the reputation of plaintiff's mark resulting from mistaken assumptions as to the origin of defendant's goods. The fact is that plaintiff's *Esprit* mark has no significant reputation. If any confusion may occur, it will do no harm to plaintiff.

In addition, the likelihood of confusion is smaller here than in *Mushroom Makers* or *Avon* because in each of those cases, the trademark in question was of the strong, distinctive, arbitrary or fanciful type. *Avon, supra,* 279 F.2d at 610 (the "Haymakers" mark ... as applied to women's shoes is fanciful and arbitrary); *Mush-*

room *Makers, supra,* 580 F.2d at 48 ("MUSHROOMS ... was 'arbitrary and fanciful' and therefore conceptually strong when applied to footwear."). As noted above, the mark *Esprit* does not have distinctive, arbitrary or fanciful characteristics that would place it in a strong trademark class. Nor had plaintiff built up its strength by developing any significant consumer recognition. The distinctiveness of the "Mushroom" and "Haymaker" marks made confusion more likely because customers were more likely to assume that so distinctive a mark on related products must indicate the same source. The weakness of this plaintiff's mark suggests a lower likelihood of confusion.

Notwithstanding the likelihood of confusion found in those cases, the Court of Appeals nonetheless affirmed denial of relief. For similar reasons, as discussed above, I find that defendant's use of *Esprit* for sportswear has not infringed plaintiff's rights to the *Esprit* mark for shoes.

### 2. *Defendant's Shoe Lines*

■ As to defendant's sales of shoes, the considerations are different. I conclude that defendant's marketing of shoes does violate plaintiff's rights in its mark *Esprit.*

As noted in the recitation of the facts above, defendant paid little heed to the part of its attorney's advice that cautioned not to use *Esprit* in the marketing of shoes and not to market shoes through the *Esprit* catalogues. Until the institution of this lawsuit, defendant included shoes along with its clothing lines in its trademark unification program, using *Esprit* together with the old divisional label "In Good Hands." When the lawsuit was brought, *Esprit* was modestly changed to *Esprit de Corp.* However, shoes continued to be offered through the *Esprit* mail order catalogues, with tiny inconspicuous legends noting that "footwear [is] by Esprit de Corp." Also, shoes were advertised under the name *Esprit* and sold in *Esprit* stores.

*Polaroid Factors Applied to Defendant's Sale of Shoes*

Although the *Polaroid* factors were originally set forth in the context of evaluation of "different" or "non-competing" products, *see Polaroid, supra* at 498; *McGregor-Doninger, supra,* 599 F.2d at 1139; *Scarves By Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1173 (2d Cir.1976), it has been recognized that the exercise is pertinent also where the products are "competing" or "substantially similar." *Thompson Medical Co., Inc. v. Pfizer, supra,* 753 F.2d at 214; *American International Group, Inc. v. London American International Corp.,* 664 F.2d 348, 351 n. 21 (2d Cir.1981); *Vitarroz v. Borden, Inc.,* 664 F.2d 960, 967–68 (2d Cir.1981).

Evaluation of the *Polaroid* factors pertaining to defendant's sale of women's shoes leads to the conclusion that defendant has infringed plaintiff's mark.

(a) *Strength of Plaintiff's Mark.* The issue of the strength of plaintiff's mark is discussed above and does not change with respect to defendant's sale of shoes.

(b) *Similarity of Marks.* Defendant contends that it markets shoes under a mark different from plaintiff's in that its shoes and boxes are labeled *Esprit de Corp.,* rather than *Esprit.* As a factual matter, however, notwithstanding its placement of *Esprit de Corp.* on the shoes and boxes and its use of a distinctively designed box, defendant is, nonetheless, using the *Esprit* mark very substantially in its selling of shoes.

Defendant's advertising shows its shoes, together with its clothing, under the name *Esprit.* Nothing in the ads suggests that the shoes go under a different name. *See, e.g.,* DX–220 pp 9, 21, 27; 221 p. 2; 268.

The defendant markets its shoes in its own *Esprit* stores devoted exclusively to the defendant's merchandise. Although the shoe departments are labeled *Esprit de Corp,* the store itself is called *Esprit* and is dominated by the *Esprit* name.

The shoes also are sold to the public through mail order catalogues that promote the entire *Esprit* line under the *Esprit* mark. The name *Esprit* dominates the catalogues appearing on the cover in big letters and on most pages. Defendant relies on the fact that its catalogues advise "Footwear by Esprit de Corp." (In 1982 the catalogue contained the advice "Shoes by *In Good Hands,* Division of Esprit De Corp.", DX 258, p. 14 N.) While it is true that this message is in the catalogue, it would require an unusually interested and meticulous reader to notice it. The message is in tiny print, inconspicuously placed. *See, e.g.,* DX–230 p 7; 231 pp 13, 14, 19, 21, 22, 25; DX–232A pp 2, 5, 7, 9, 11, 13, 15, 16, 19, 20, 23, 24; 265 (last page), *Winter '84* catalogue (unnumbered exhibit) at pp 22–23 and 39. Most pages of the catalogue over the years have shown models apparently dressed top to toe in *Esprit* garb, including shoes. The "Shoes by Esprit de Corp" legend does not appear on some pages which, while showing shoes, do not provide purchase information, *see, e.g.,* DX–268. In fact, some pages that do furnish shoe purchase information do not show the legend. *See, e.g.,* DX–220 pp 9, 21, 27, 31 and DX–221 p. 2.

When a customer orders shoes out of the catalogue, she places the order on a form dominated by the *Esprit* mark; the merchandise arrives in packaging materials labeled Esprit and with packing slips showing the *Esprit* mark.

It is also noteworthy that under the circumstances, given especially the fame of defendant's *Esprit* name, the *Esprit de Corp* mark in the shoes lends itself to contraction into simple "Esprit." There was evidence that customers buying defendant's shoes refer to them as "Esprit shoes."

Defendant stresses that the major part of its merchandise is sold in independent stores, and that in such outlets shoes are separated from clothing; in shoe stores, there is no clothing at all so that the only merchandise from defendant would be that bearing the *Esprit de Corp* label, and in department stores, shoe departments would be separate from the departments

where defendant's *Esprit* clothing is shown. These facts, however, are neither complete nor satisfactory answers to the problem. While in large department stores the shoe department may be quite distant from the clothing, in smaller sportswear shops the two may be elbow to elbow. Also, it would be to the store's advantage to make much of defendant's popular *Esprit* label; defendant cannot prevent salesmen from directing their *Esprit*-seeking customers to the defendant's "Esprit shoes." It would be in the interest of such merchants to minimize the trademark difference between defendant's *Esprit* clothes and defendant's *Esprit de Corp* shoes. For example, if a customer entered a store that carried defendant's but not plaintiff's shoes, and asked, "Do you have *Esprit* shoes?," it can be assumed the customer would not be turned away.

In sum, although the defendant has made some effort to distance its shoes from its *Esprit* mark, that effort has been modest at best and correspondingly unsuccessful. The record suggests that the average fashion conscious consumer would understand the words "Esprit shoes" as a reference to defendant's merchandise.

(c) *Proximity of Products and Bridging the Gap.* Defendant contends that to describe plaintiff's and defendant's merchandise simply as women's shoes overstates the proximity of the products. It points to style differences between its merchandise and plaintiff's, as well as to the different clienteles they appeal to. Plaintiff's merchandise is more formal and traditional. Defendant's shoes are contemporary in their designs and colors, far more sporty and informal. Defendant argues it is unlikely that the customers for either one would have much interest in the merchandise of the other.

Although defendant's observations have some merit, I question how much weight they are entitled to. First, although plaintiff and defendant may have few shared customers, their shoe merchandise is sold largely in the same channels of commerce and through the same types of outlets.

The fact that they have few retail outlets in common is as much a consequence of plaintiff's lack of success in promoting its line as it is of differences in the type of merchandise. Merely by better buying, better marketing or more aggressive advertising plaintiff could increase the number of stores that might potentially carry both lines.

Also, the distance between their merchandise is less than defendant contends. Although plaintiff's most successful line appears to be a traditional dressy high-heeled shoe with pointed toe (Victor Dep., pp 17–18, 20; Orent Dep., pp 80, 94), plaintiff's catalogue has included a number of sport models including sandals and low-heeled thong shoes. *See, e.g.,* PX–28, Nos. 11, 19, 26; PX–30, Nos. 1, 2, 10, 11, 15, 47, 53; PX–31, Nos. 28, 29; PX–32, Nos. 7, 9, 10, 31–33; PX–34, Nos. 1, 12, 20, 67, 80, 87; PX–35, No. 17; PX–36, Nos. 3, 18, 53, 60; PX–37, Nos. 3, 5, 6, 8, 12, 15, 16, 24, 29, 38, 46; PX–40, Nos. 6, 11, 15; PX–42, Nos. 18505, 37506, 77504. By more aggressive and successful promotion of such existing lines, plaintiff could compete more directly with defendant.

Nor is it correct that defendant restricts itself to low-heeled sport models. In the expansion of its shoe division, defendant has also sold dressy, high-heeled, narrow-toed models. *See* DX–223, p. 25, No. 7013; DX–225 p. 17, No. N8018; defendant's *Winter '84* catalogue (unnumbered exhibit) at pp 22–23. Although these shoes no doubt exhibit some difference from plaintiff's, they are generally of similar type, for the same kinds of occasions, and in a roughly similar price range.

(d) *Quality of Defendant's products.* The quality factor does not play any significant role in this litigation as to defendant's shoes (any more than as to defendant's clothing). Although some of defendant's shoe products have been inexpensive canvas shoes, particularly in the earlier years, plaintiff has not shown that poor quality has caused customer dissatisfaction of a sort that could harm plaintiff's reputation by reason of confusion. *See Mushroom*

*Makers Inc., supra,* 580 F.2d 44, 49; *Lever Brothers Co., supra,* 693 F.2d at 258; and *Procter & Gamble, supra,* 485 F.Supp. at 1202.

(e) *Customer Sophistication and Actual Confusion.*

It is not surprising that the record reflects a number of instances of actual confusion. For example, Turner (Turner Dep., pp 8–11); Shapiro (Shapiro Dep., pp 12–14), and Eckhardt (Eckhardt Dep., pp 66–68), all of whom sell plaintiff's Esprit shoes, testified that customers ask whether the shoes come from the defendant. Evans, a buyer for a large store called plaintiff looking for defendant's shoes. (Evans Dep., pp 13–14, 26–29.) Lubovsky, the owner of plaintiff, testified to numerous such instances of confusion and also to the concern that customers might believe plaintiff was infringing on defendant's rights to the mark *Esprit.* (Lubovsky Dep., pp 3, 90–92, PX 128, 131.) One shoe store owner, Fausone, who carried plaintiff's Esprit shoes, testified that customers who had seen defendant's shoes offered for less believed his merchandise was defendant's and that he was overcharging. He testified he was forced to cut the price on plaintiff's Esprit shoes by one-half to unload them. (Fausone Dep., pp 27–30.) Orent, a salesman of plaintiff's merchandise, testified that he encountered resistance to carrying plaintiff's Esprit label because of the likelihood of confusion with defendant's merchandise.[6] In addition, there was evidence of consider-able confusion at a shoe show featuring both plaintiff and defendant when telephone calls seeking plaintiff were misrouted by the operator to defendant, and vice versa. (Garber Dep., pp 114–15.)

(f) *Defendant's Good or Bad Faith.* The issue of defendant's good faith as to its sale of shoes differs substantially from its sale of clothing. First, defendant was constructively on notice by reason of plaintiff's registration. And while plaintiff's registration for shoes was of little consequence as to defendant's right to use *Esprit* for clothing, it was of great consequence as concerned defendant's right to use *Esprit* for shoes.

Furthermore, when defendant became aware of plaintiff's rights, it acted with considerable disregard for those rights. After defendant had learned that plaintiff possessed valid rights to exclusive use of *Esprit* for women's shoes and had received its lawyer's advice not to use *Esprit* in selling or advertising shoes, defendant, nonetheless, proceeded to use the mark on shoes. In making a small change to *Esprit de Corp* after plaintiff brought suit while continuing to sell shoes under the umbrella of its heavy publicizing of its *Esprit* mark, defendant has failed to accord reasonable deference to plaintiff's exercise of its lawful trademark rights. In disregard of its counsel's advice, defendant has continuously sold its shoes through the Esprit catalogues where, notwithstanding tiny incon-

---

**6.** Orent testified (by affidavit) that he believed this had occurred in connection with Bullock's, Nordstrom and J.W. Robinson. I recognize that this testimony was somewhat undermined. Bullock's buyer, Putnam, did not remember the conversation and doubted he had made the statement. Robinson's buyer Fowler, who carries defendant's shoes and testified they were doing great, denied Orent's story. He said he had no interest in buying from Orent because Orent was always selling different stuff. Defendant also showed that Bullock's and Nordstrom carried plaintiff's merchandise on their private label rather than in the Esprit label. In my view, the attempted impeachment was partially but not wholly successful. Bullock's and Robinson's buyers might well have said such a thing notwithstanding lack of memory of it. And as to private labeling, it is only done for substantial orders. The fact that these stores ordered most of their merchandise from plaintiff in bulk and in private label does not exclude the possibility that they might have considered ordering additional styles in smaller quantities not justifying the private labeling. Another possibility is that Orent correctly remembered the incidents but erred in his identification of the accounts. I see no reason to believe that Orent, who unhesitatingly testified unfavorably to plaintiff on other issues, fabricated these incidents. More importantly, regardless of the accuracy of Orent's testimony, it does not seem unlikely that such might happen in the future. A store that carried defendant's shoes might well wish to avoid the potential confusion that might result from its carrying other unrelated merchandise marked Esprit.

spicuous legends that "Footwear [is] by Esprit de Corp.," the shoes are presented as Esprit merchandise. The sale of shoes in defendant's Esprit shops also presents them as Esprit merchandise, notwithstanding the labels Esprit de Corp. on the boxes and sock linings.

It was greatly to defendant's advantage to use its highly successful *Esprit* mark in connection with its sale of shoes. That is essentially what it has done, under thin disguise.

As sins go in the area of trademark infringement, this was far from the most heinous. It does not compare, for example, to free riding on another's reputation, deceiving the public. *See W.E. Bassett Co. v. Revlon, Inc.,* 305 F.Supp. 581 (S.D.N.Y. 1969), *rev. in part on other grounds,* 435 F.2d 656; *Stix Products Inc. v. United Merchants & Mfrs. Inc.,* 295 F.Supp. 479 (S.D.N.Y.1968); *Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co.,* 232 F.Supp. 493 (S.D.N.Y.1963). It is not so much a question of bad faith as of disregard for plaintiff's rights. Defendant first adopted the Esprit mark for clothes in the correct perception that this would not infringe plaintiff's rights for shoes. Then as defendant successfully built the mark into a powerful commercial force and wished to reap the benefits, it used the mark also to promote its sale of shoes, with little regard for plaintiff's rights to exclusive use in that area.

(g) *Relative Harm.* The relative harm from grant or denial of an injunction falls far more heavily on the defendant than on the plaintiff. As noted above, the *Esprit* mark is of no great value to plaintiff in selling shoes. Plaintiff has made no showing that any significant part of its business depends on the exploitation of the *Esprit* mark. Defendant, on the other hand, has built up a huge goodwill in favorable consumer recognition of its *Esprit* mark and has used this most successfully in building its shoe sales to a $15 million volume. Although defendant's success in selling shoes has resulted in part from its imaginative selection of merchandise and its lively, suc-

cessful publicity, there can be no doubt that the success of the shoe line has benefited enormously from defendant's success in building up the Esprit name and would suffer from its loss.

*Likelihood of Confusion—Infringement— Remedy*

I find that plaintiff has shown a substantial likelihood of confusion and infringement resulting from defendant's use of *Esprit* in the sale of shoes. Defendant argues that since it is "reverse confusion," i.e., consumer assumption that the senior user's merchandise emanates from the junior, the plaintiff has suffered no harm and is entitled to no relief. Defendant's argument goes too far.

Plaintiff has shown harm resulting from the confusion. It has shown both loss of sales and loss of efficiency. I have no doubt that plaintiff is entitled to some relief.

What the relief should be is more puzzling and is left by the parties' stipulation to the next phase of this split trial.

It is clear plaintiff is entitled to whatever modest damages it is able to show it has incurred by reason of the infringement. But it is unlikely plaintiff will be able to show the defendant has profited from the infringement, 15 U.S.C. § 1117, for none of defendant's sales were attributable to plaintiff's goodwill in the mark.

More troublesome is whether plaintiff is entitled to an injunction and, if so, of what scope and nature. A broad, far-reaching injunction barring defendant from selling shoes in any manner connected to its *Esprit* mark would cost the defendant millions. So far as the evidence shows, on the other hand, plaintiff's business would be virtually unaffected whether an injunction is granted or denied. There is no convincing showing that plaintiff would lose a single sale if it dropped *Esprit* and instead used *Robertina,* or another mark. At present, the principal value of the *Esprit* mark to plaintiff lies in the price plaintiff can extract from defendant for its sale. A far reaching injunction would so damage

defendant that it would permit plaintiff to demand a very high price.

It is surely not the proper function of an equitable decree to give plaintiff's mark an extortion value far beyond the value it possess in plaintiff's business. From this point of view, it may be questioned whether plaintiff should receive any injunction at all.

On the other hand, plaintiff has used its mark continuously in its business for many years. The trademark law promises it exclusive rights within a limited area resulting from such use. It should not be penalized for having avoided the risks of heavy investment in brand advertising. Surely plaintiff should not be forced either to drop its mark or suffer unacceptable encroachment on an area reserved to it by law, merely because a new infringing venturer has been bold, aggressive and successful.

Perhaps the fairest solution will be to award an injunction of modest provisions, that will not excessively deprive defendant of the benefit of the valuable goodwill it has built up (and, accordingly, does not give plaintiff a lever for unconscionable extortion), but which requires the defendant to take more effective steps to distinguish its shoe mark from *Esprit* and to avoid potential confusion. Plaintiff would be left with wider scope for exercise of its trademark rights but would not receive the benefit of high extortion value premised on the loss inflicted on defendant by the injunction.

SO ORDERED.