**PACO SPORT, LTD., Plaintiff,**

**v.**

**PACO RABANNE PARFUMS, Defendant.**

**No. 96 Civ. 1408(JES).**

United States District Court,
S.D. New York.

Feb. 17, 2000.

Rubin Ferziger, New York City, for plaintiff.

John T. Jacobs, Los Angeles, CA, for plaintiff.

Amster, Rothstein & Ebenstein, New York City, Anthony Locicero, Chester Rothstein, of counsel, for plaintiff.

Weil, Gotshal & Manges, New York City, Robert G. Sugarman, Lynda M. Braun, David L. Yohai, of counsel, for defendant.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

In this action for a declaratory judgment, plaintiff Paco Sport, Ltd., ("Paco Sport")[1], seeks a declaration that its use of the trademarks PACO and PACO SPORT on clothing does not infringe upon the rights of defendant Paco Rabanne Parfums ("Paco Rabanne"), in its federally registered trademarks PACO and PACO RABANNE. *See* Complaint at ¶¶ 1, 2, 4. Paco Rabanne asserts counterclaims of trademark infringement and false designation of origin under sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), trademark dilution under section 360-1 (formerly 368-d) of New York General Business Law, and unfair competition under common law. *See* Answer & Counterclaim at ¶¶ 9–11. Paco Rabanne seeks to enjoin Paco Sport permanently from using the word "Paco," alone or in combination with other words, in connection with advertising or sale of denim jeans or any other apparel or related products. Paco Rabanne also seeks an accounting of Paco

---

1. "Paco Sport" refers collectively to plaintiff Paco Sport, Ltd., and its predecessor in inter- est, Maximen International Corporation.

Sport's profits derived from the alleged trademark infringement and an award of reasonable attorneys' fees and costs. *See* Answer & Counterclaim at ¶¶ 11–13; Defendant's Post–Trial Memorandum of Law ("Def.Mem.") at 25.[2] A bench trial was held, and both parties filed post-trial memoranda of law. Upon considering all the evidence presented, as well as the arguments made by the parties' counsel at trial and in their papers filed with the Court, the Court, for the reasons set forth below, concludes that Paco Sport did not infringe upon Paco Rabanne's trademark rights. Accordingly, the Court grants Paco Sport's request for a declaratory judgment and denies Paco Rabanne's requests for a permanent injunction, an accounting, and costs.

## BACKGROUND

Paco Sport markets inexpensive casual clothing in the United States, Puerto Rico and the Caribbean. *See* Transcript of Preliminary Injunction Hearing ("Tr.H.") 10/3/96 at 394, 440. The company's primary target market consists of young, urban Hispanic and Black males. *See* Transcript of Trial ("Tr. T.") 6/18/98 at 156–62; Tr. H. 10/3/96 at 394, 402. Since 1989, Paco Sport has been marketing jeans, shirts, and other clothing under the name PACO alone and in combinations such as PACO SPORT, PACO JEANS, and others. *See* Tr. H. 10/3/96 at 396, 402. The clothing generally features large labels, overstated sizes, bright colors, and embroidery. *See* Defendant's Exhibits ("Dx") EEEE, FFFF, GGGG; Tr. T. 6/23/98 at 343; Plaintiff's Exhibits ("Px") 70–79. Paco Sport's advertising emphasizes the youthful and ethnic orientation of its clothing, featuring young men and boys in baggy, colorful sportswear. *See* Px 123; Dx UUU, WWWWWW, ZZZZZZ. The average retail price of Paco Sport's jeans is approximately $25–$30 per piece. *See* Tr. H. 7/15/96 at 317. Paco Sport sells its apparel to retailers with stores in predominately minority neighborhoods, such as VIM, Cooky's Department Stores, and Wertheimer's Department Stores. *See* Tr. H. 7/9/96 at 176; Tr. H. 7/15/96 at 317, 325.

Between 1989 and 1996, Paco Sport sold over 10 million pieces of clothing, and its annual sales grew from $3.5 million in 1989 to approximately $27 million in 1995. The company's advertising expenses reached approximately $500,000 in 1995. *See* Tr. H. 10/3/96 at 425, 437–39. PACO brand products account for approximately 90% of Paco Sport's total sales and 100% of its advertising expenses. *See* Tr. T. 6/18/98 at 122. By March 1998, the sales of PACO brand goods were approximately $163.8 million, resulting in approximately $8.4 million of profits. *See* Tr. T. 6/18/98 at 119–20; Px 136.

Twice, Paco Sport unsuccessfully attempted to register its trademark PACO with the United States Patent and Trademark Office. The registration was refused because of the possible confusion between Paco Sport's mark and a previously registered trademark "PaCo," owned by a producer of women's hosiery not related to this lawsuit. *See* Tr. H. 10/3/96 at 396–97, 402–03; Px 94; Dx CCCC, ZZZ. In 1991, Paco Sport registered the trademark Le-PACO, but the company's attempt to use this trademark on clothing failed. According to Paco Sport's President Mr. Badr Jebara, the trademark was not simple enough and the company's customers did not "want to be bothered" with a French name. Tr. H. 10/3/96 at 468–69; *see also* Dx AAAA; Tr. H. 10/3/96 at 398–99.

Paco Sport has never used the name "Paco Rabanne" on its products, nor has it ever sold or had any intention of selling perfumes, cosmetics or toiletries. *See* Tr. H. 10/3/96 at 436.

Defendant Paco Rabanne manufactures and markets fragrances and cosmetics worldwide. *See* Tr. T. 6/23/98 at 222.

**2.** Originally, Paco Rabanne had also sought an award of damages, *see* Answer & Counterclaim at ¶ 12, but it eventually abandoned that request, *see* Def.Mem. at 25.

Paco Rabanne is the fictitious name of the designer Francisco Rabaneda y Cuervo, who in the 1960's founded an upscale clothing company and a fragrance company Paco Rabanne Parfums in its present form was created in 1988 when the fragrance company purchased the clothing company from the designer and other shareholders. *See* Tr. T. 6/23/98 at 223. In addition to manufacturing and selling fragrances and cosmetics, the company also licenses the use of its trademarks on other products, such as sunglasses, ties, scarves, shoes, and clothing. *See* Tr. T. 6/23/98 at 222–23.

In the United States, Paco Rabanne sells fragrances and cosmetics almost exclusively. *See* Tr. T. 6/23/98 at 275–76. During the last ten years, Paco Rabanne's fragrance and cosmetics sales in this country exceeded $200 million, and the company spent over $100 million on print, television, and other advertising. *See* Tr. T. 6/23/98 at 342. In marked contrast, Paco Rabanne's clothing sales in this country are minimal. Paco Rabanne has presented no evidence of any clothing sales in the United States prior to 1994. Since 1994, the company has sold only approximately 200 pieces of clothing. *See* Tr. T. 6/23/98 at 250–53. By 1996, clothing sales had reached only $120,000 annually. *See* Tr. H. 7/15/96 at 189. Paco Rabanne has presented no evidence of sales of clothing or related products by its licensees in this country. *See* Tr. H. 7/15/96 at 190–91; Tr. T. 6/23/98 at 250.

Over the years, Paco Rabanne has developed and maintained an upscale and fashionable image. Its target market consists of fashion-conscious consumers who pay high prices for Paco Rabanne products. *See* Tr. T. 6/23/98 at 207–08, 342–43. Paco Rabanne's fragrances are perceived as symbols of prestige and high social and economic status. *See* Tr. T. 6/23/98 at 207, 211–12; Tr. T. 10/1/98 at 372, 389. In the United States, the company distributes its products through exclusive specialty and department stores, such as Saks Fifth Avenue, Bloomingdale's and Lord & Taylor. *See* Dx QQ; Tr. H. 7/9/96 at 60. Paco Rabanne's exclusive distributor in the United States, Compar, Inc., makes substantial efforts to limit the importation of "gray market" and counterfeit fragrances under Paco Rabanne's name and their sale in drug and discount stores. *See* Tr. T. 6/23/98 at 347–50; Tr. H. 7/9/96 at 26–28; Dx OO.

Prior to 1996, Paco Rabanne used variations on the trademark PACO RABANNE only on its products, and it did not market products under the name PACO alone. *See* Tr. H. 7/9/96 at 38; Tr. H. 7/15/96 at 191–92; Tr. T. 6/23/98 at 232–33. In 1996, Paco Rabanne launched a new unisex fragrance PACO. Eventually, the PACO line was to include sunglasses, bags, and a collection of upscale "ready-to-wear" clothing. *See* Tr. T. 6/23/98 at 232, 341. In the United States, only the fragrance was introduced. *See* Tr. T. 6/23/98 at 232–34, 341.

Since 1970, Paco Rabanne has owned several federally registered trademarks that are variations on the mark PACO RABANNE. *See* Dx A, C–G.[3] Since 1976, the company has also owned the registered trademark PACO for use on perfumes, colognes, toilet water, and other cosmetics and toiletries. *See* Dx B, H. The mark, however, was not used, and in 1995 the company's management was concerned that the registration may have been forfeited. *See* Px 60.

In 1993, Robert McCormick, vice-president of Compar, and Craig Morton, Com-

---

**3.** These trademarks are: PACO RABANNE for use on perfumes, colognes, and other fragrance and cosmetics products; PACO RABANNE for use on eyeglass frames, jewelry, luggage, and accessories; PACO RABANNE for use on handkerchiefs and wearing apparel for men and women; PACO RABANNE for use on clothing and sportswear for men; PR PACO RABANNE POUR HOMME for use on toilet water, aftershaves, soaps, talcs and shaving cream for men; PR SPORT DE PACO RABANNE for use on toilet water. *See* Dx A, C–G.

par's advertising director, noticed bright-colored casual shirts bearing the mark PACO in a store in Manhattan. They bought two shirts, and sent them to Paco Rabanne's headquarters in France. *See* Tr. H. 7/9/96 at 23; Tr. H. 10/3/96 at 504; Tr. T. 6/23/98 at 240. The shirts did not cause serious concern either to Paco Rabanne or to Compar, and the companies took no action at the time, nor did they investigate the issue further. *See* Tr. H. 7/9/96 at 24–25, 50–51; Tr. T. 6/23/98 at 240–43. On the contrary, the shirts became a joke at Compar, where the designs of the shirts were seen as "outrageous" and "humorous." *See* Tr. H. 7/9/96 at 50–51. Mr. Morton noticed at that time that the shirts clearly targeted a market different from Paco Rabanne's. *See* Tr. H. 7/9/96 at 25, 50–51.

Paco Sport's use of the name PACO attracted Paco Rabanne's attention in the fall of 1995, when Paco Sport's advertisements appeared on billboards, buses, and in the subway in New York City. *See* Px 19, 55; Tr. H. 10/3/96 at 505; Tr. T. 6/23/98 at 243. On December 1, 1995, Paco Rabanne's attorneys sent a letter to Robert Jebara, President of Paco Sport, demanding that Paco Sport discontinue marketing any products bearing the mark PACO. *See* Answer and Counterclaim Exhibit A. On December 6, 1995, Paco Sport commenced the present action for a declaratory judgment in the United States District Court for the Central District of California. *See* Complaint at ¶¶ 1–4. Paco Rabanne asserted counterclaims of trademark infringement, false designation of origin, trademark dilution, and unfair competition, and requested injunctive and other relief. *See* Answer and Counterclaim at ¶¶ 9–13. The case was subsequently transferred to this Court

Paco Rabanne filed a motion for a preliminary injunction, which Paco Sport opposed. After a hearing, the Court denied Paco Rabanne's motion, finding that Paco Rabanne had failed to prove a high likelihood of success on the merits; that at best, Paco Rabanne had shown substantial questions going to the merits; and that the balance of hardships tipped in Paco Sport's favor. Tr. H. 1/30/97 at 8, 12. The United States Court of Appeals for the Second Circuit affirmed this denial. *See Paco Sport, Ltd. v. Paco Rabanne*, 112 F.3d 504 (2d Cir.1997) (table opinion). A bench trial was then held.

## DISCUSSION

### I. LANHAM ACT CLAIMS

Paco Rabanne asserts counterclaims of trademark infringement under 15 U.S.C. § 1114[4] and false designation of origin under 15 U.S.C. § 1125(a).[5] To prevail on a trademark infringement claim under either of these provisions, the trademark's possessor must prove two ele-

---

4. 15 U.S.C. § 1114 provides in pertinent part: Any person who shall, without the consent of the registrant ... use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

5. 15 U.S.C. § 1125(a) provides in pertinent part: Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

ments: (1) that its trademark is valid and entitled to protection and (2) that the contested use of the trademark is likely to cause confusion among consumers. *See Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir.1999). A trademark is entitled to protection if it is inherently distinctive or if it is descriptive and has acquired secondary meaning in the marketplace. *See id.* Secondary meaning attaches to a term when in the minds of the consumers the term becomes synonymous with the business and primarily identifies the business. *See id.*

■ Even if the claimant's trademark is entitled to protection, a trademark infringement claim cannot succeed without proof that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question." *Id.* (quoting *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir.1993)). It is well settled in this Circuit that in evaluating the likelihood of confusion, courts consider the eight factors established by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961), ("the *Polaroid* factors"). These factors include: (1) the strength of the senior user's trademark; (2) the degree of similarity between the contested trademarks; (3) the competitive proximity of the products; (4) the likelihood that the senior user will "bridge the gap" by entering the junior user's market; (5) actual confusion; (6) the junior user's good faith in adopting its mark; (7) the quality of the junior user's product; and (8) the sophistication of relevant consumers. *See id.; see also Time*, 173 F.3d at 117.

In the present case, the Court finds based upon an evaluation of these factors that although Paco Rabanne's trademarks

PACO and PACO RABANNE are valid and entitled to protection, Paco Rabanne has failed to prove likelihood of confusion.

## A. PROTECTABILITY OF PACO RABANNE'S TRADEMARKS

■ Assessment of a trademark's protectability begins with appraising the trademark's inherent capacity to identify the source of a product and classifying the trademark in one of four categories of inherent distinctiveness. *See Time*, 173 F.3d at 117, 118. These categories, outlined in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2d Cir. 1976), are generic, descriptive, suggestive, and arbitrary/fanciful.[6] Generic terms are never entitled to protection. Suggestive, arbitrary and fanciful terms, on the other hand, are inherently distinctive and generally entitled to protection. Descriptive terms are not inherently distinctive, but are nonetheless entitled to protection if they acquire secondary meaning in the marketplace. *See PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 561–62 (2d Cir.1990); *Abercrombie & Fitch*, 537 F.2d at 9–11. Personal names, either surname—or first names, are generally classified as descriptive terms, because "a name might be regarded as a convenient description of the fact that the individual was affiliated with the firm." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir. 1990) (citing *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 104 (2d Cir.1985)).

In the present case, Paco Rabanne seeks to protect its trademarks PACO and PACO RABANNE. *See* Answer & Complaint at ¶¶ 1, 2, 4. "Paco" is a common Hispanic nickname, used as a short form of "Francisco," and "Paco Rabanne" is the fictitious name of the designer who found-

6. Generic terms refer to the genus or class to which the product belongs; for example, "drugs" is a generic term. Descriptive terms convey an immediate impression of some attribute or characteristic of the product. Suggestive terms require some imagination on the part of the consumer in order to ascertain the nature of the product. Arbitrary terms have an independent meaning but one that is not usually associated with the particular product. Fanciful terms have no independent meaning. *See PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 561–62 (2d Cir.1990); *Abercrombie & Fitch*, 537 F.2d at 9–11.

ed the company. Accordingly, the trademarks are descriptive and, had they not been registered, would have been entitled to protection only with proof of secondary meaning. The registration of the trademarks, however, curtails the protectability analysis. *See Conopco, Inc. v. Cosmair, Inc.*, 49 F.Supp.2d 242, 247 (S.D.N.Y.1999).

The registration of a trademark by the United States Patent and Trademark Office may create the presumption that the mark is entitled to protection and thus relieve the owner of the burden of proving protectability. Under 15 U.S.C. § 1115, registration of a trademark is *prima facie* evidence of the trademark's validity, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce "on or in connection with the goods or services specified in the registration." 15 U.S.C.A. § 1115(a); *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ("[R]egistered trademarks are presumed to be distinctive."); *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1132 (2d Cir.1979). Furthermore, if the registered trademark becomes "incontestable" after five years of continuous use, the presumptions of validity, ownership, and exclusive right to use the trademark become irrebuttable. 15 U.S.C.A. § 1115(b) (West 1998).[7] Accordingly, such registered trademarks are conclusively presumed to be valid and entitled to protection. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 205, 105 S.Ct. 658, 83 L.Ed.2d 582 (holding that an incontestable mark may not be challenged as merely descriptive).

Here, Paco Rabanne has owned registrations of the trademarks PACO RABANNE and PACO since 1970 and 1976

respectively. *See* Dx A–H. Paco Rabanne claims that the trademarks are incontestable, and Paco Sport does not dispute this claim. *See* Def.Mem. at 6–7; Plaintiff's Post–Trial Memorandum of Law ("Pl. Mem.") at 3. Accordingly, the Court assumes for the purposes of the decision that the trademarks are entitled to protection.[8]

## B. LIKELIHOOD OF CONFUSION: THE POLAROID FACTORS

■ Having established that Paco Rabanne's trademarks PACO and PACO RABANNE are entitled to protection, the Court must now determine the scope of protection appropriate for the trademarks. *See Time*, 173 F.3d at 118 ("[I]ncontestability ... does not alter the breadth of infringement protection that a mark is accorded."). To prevail on its infringement claim, Paco Rabanne must demonstrate that Paco Sport's use of the trademark PACO is likely to confuse consumers about the source of the products. *See id.* at 117. An analysis of the *Polaroid* factors leads the Court to conclude that confusion is not probable.

### 1. Strength of Paco Rabanne's Trademarks

The courts have defined the strength of a trademark as its inherent and acquired capacity to identify the source of a product. *See Time*, 173 F.3d at 117. "The strength of a mark is directly related to likelihood of confusion, for the stronger the mark, the more likely that the consumer will associate it with the familiar purveyor." *H. Lubovsky, Inc. v. Esprit De Corp.*, 627 F.Supp. 483, 486–87 (S.D.N.Y.1986). In analyzing this *Polaroid* factor, the courts consider both the inherent distinctiveness of the trademark and its strength

7. The presumptions can be challenged on several grounds inapplicable to the present case.

8. Although Paco Sport does not challenge the validity of the PACO mark, the Court notes its doubts about the incontestability of the trademark PACO. As discussed below, evidence presented at trial indicates that the company

only occasionally used the name PACO alone (not in conjunction with the name RABANNE), and mostly in advertising and promotions rather than on products. *See* Tr. H. 7/9/96 at 8–14, 38–40; Tr. H. 7/15/96 at 192; Tr. T. 6/23/98 at 232–33; Px 60; Dx QQ, RR, SS, UU.

acquired through use in the marketplace. *See Time,* 173 F.3d at 117–18 (citing *Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 743–44 (2d Cir.1998)). The analysis involves many of the same factors that initially determine the trademark's protectability, such as the classification of the trademark on the *Abercrombie* continuum as generic, descriptive, suggestive, or arbitrary/fanciful and the existence of secondary meaning. *See id.*

The registration of a trademark is also relevant to the assessment of its strength because, as discussed above, an incontestible registered trademark enjoys a conclusive presumption of distinctiveness. *See Park 'N Fly,* 469 U.S. at 205, 105 S.Ct. 658 (holding that an incontestable mark may not be challenged as merely descriptive); *Lois Sportswear,* 799 F.2d at 871 ("[R]egistered trademarks are presumed to be distinctive."). The presumption, however, applies only when the trademark is used on the products specified in the registration. *See* 15 U.S.C. §§ 1115(a), (b) (registration is evidence of a trademark's validity, registration, ownership and exclusive right to use it "on or in connection with the goods or services specified"); *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 48 (2d Cir.1978) ("[E]ven if a mark is registered, the presumption of an exclusive right to use it extends only so far as the goods or services noted in the registration certificate."); *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 613 n. 7 (2d Cir.1960) ("[I]ncontestability ... would carry a conclusive presumption of the plaintiffs' exclusive right to use its marks only on shoes [the goods specified in the registration certificate].").

Furthermore, the presumption of distinctiveness applies only to the trademark as a whole, and does not extend to its components. *See Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1043 (2d Cir.1980) (holding that the owner of a registered trademark "Saratoga Vichy" could not assert rights in an unregistered trademark "Saratoga" absent proof of secondary meaning); *see also In re National Data Corp.,* 753 F.2d 1056, 1059 (Fed.Cir. 1985) ("[R]egistration affords *prima facie* rights in the mark *as a whole,* not in any component.") (emphasis added); *Beneficial Corp. v. Beneficial Capital Corp.,* 529 F.Supp. 445, 447 n. 1 (S.D.N.Y.1982) (reasoning that the registration of the mark "Beneficial Finance System" did not create the presumption that the name "Beneficial," standing alone would have been sufficiently distinctive to be entitled to protection).

In the present case, Paco Rabanne's only registration of the mark PACO is for use on fragrances and various cosmetics products. *See* Dx B, H. This registration, therefore, cannot create the presumption that the trademark PACO is distinctive when used on clothing. Paco Rabanne's other registered marks, including the registration in the clothing category, include the words PACO RABANNE. *See* Dx A, C–G. Accordingly, these registrations cannot create the presumption that the name PACO alone is distinctive.

As discussed above, the personal names PACO and PACO RABANNE are descriptive terms, and, therefore, inherently weak trademarks. *See Pirone,* 894 F.2d at 583. Even inherently weak trademarks, however, may acquire capacity to identify the source of the product to the public, *i.e.,* secondary meaning. *See H. Lubovsky,* 627 F.Supp. at 487. Secondary meaning attaches to a descriptive term when "in the minds of the public, the primary significance of a ... term is to identify the source of the product." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1041 (2d Cir.1992) (quoting *Inwood Labs. v. Ives Labs.,* 456 U.S. 844, 855 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Personal names acquire secondary meaning when "'the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business.'" *Pirone,* 894 F.2d at 583 (quoting

*Abraham Zion,* 761 F.2d at 104). "Proof of secondary meaning entails vigorous evidentiary requirements." *PaperCutter,* 900 F.2d at 564 (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 134 (S.D.N.Y.1972)). In assessing secondary meaning, the courts consider a variety of factors, including, but not limited to, "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1222 (2d Cir.1987).

In the present case, the evidence shows that the name PACO RABANNE has acquired limited secondary meaning in the fragrance market. The company has been using this trademark in the United States since the 1970s. *See* Tr. H. 7/9/96 at 91. All Paco Rabanne products, including its signature fragrance PACO RABANNE POUR HOMME, bear the designer's name on the packaging. *See e.g.,* Dx K, L, M, DDDD. The evidence of secondary meaning also includes the level of the company's sales ($200 million over the last ten years, *see* Tr. T. 6/23/98 at 342) and its advertising expenditures ($100 million over the last ten years, *see* Tr. T. 6/23/98 at 342). Witnesses have testified to the existence of counterfeit and "gray market" trade in fragrances under Paco Rabanne's name, and to the company's efforts to prevent this trade. *See* Tr. H. 7/9/96 at 26–27, Tr. T. 6/23/98 at 347–50; Dx OO. In addition, a fragrance industry expert, Mr. Ruttenberg, has testified that he considers Paco Rabanne a serious competitor in the industry and that in his opinion the company's brand is "formidable." *See* Dx JJJJJJJ at 3; Tr. T. 6/23/98 at 207. A brand image study ranked PACO RABANNE as # 1658 in the United States among luxury products brands in terms of recognizability. *See* Px 87b at PR0011890. Further-

more, market research studies that consumers in the United States perceive the name PACO RABANNE primarily as a name of a fragrance, and not of a real life person. *See* Px 129 at 3; Tr. T. 10/1/98 at 385–86; Px 132c at PR20006890.

Paco Rabanne argues that the name PACO alone has also acquired secondary meaning. *See* Def.Mem. at 5–6; Defendant's Post–Trial Reply Memorandum of Law ("Def.R.Mem.") at 1–2. The evidence, however, does not support this contention. Paco Rabanne has presented no evidence of having marketed products under the name PACO alone prior to the launch of its new PACO fragrance in 1996. *See* Tr. H. 7/9/96 at 38; Tr. H. 7/15/96 at 191–92. On the contrary, the full name PACO RABANNE appears in letters of equal size and prominence on bottles and packaging of Paco Rabanne's products, including the fragrance best known to the average American consumer, PACO RABANNE POUR HOMME. *See* Dx K, L, M, DDDD. Paco Rabanne's instructions to licensees also insist on the use of full name in strictly specified typeface. *See* Dx V. Even the new fragrance's bottle has the name PACO RABANNE printed in smaller letters under the name PACO. *See* Tr. T. 6/23/98 at 214; Dx P.

Paco Rabanne argues that the name PACO is the dominant part of the trademark PACO RABANNE, relying primarily on testimony that among Paco Rabanne's employees, distributors, and fragrance industry insiders, PACO was often used as the shorthand name for the designer, the company, and the company's signature fragrance PACO RABANNE POUR HOMME. *See* Def. Mem. at 5, 7–8; Tr. H. 7/9/96 at 4; Tr. T. 6/23/98 at 207–08, 230–32. This evidence, however, does support the inference that ordinary American consumers also have come to associate the common Hispanic nickname "Paco" primarily with the defendant or its fragrance.[9] *See in-*

---

9. Mr. Ruttenberg has also stated that consumers use the name PACO as a short form for

PACO RABANNE POUR HOMME and for Paco Rabanne. *See* Dx JJJJJJJ at 2. No inde-

*fra* at 27–28. Similarly, the Court cannot infer secondary meaning from occasional media references to the designer Paco Rabanne as Paco, because the submitted stories also invariably mention the full name Paco Rabanne. *See* Dx W, X, Z, AA, WW. Paco Rabanne has used the name PACO without the name RABANNE in some of its advertising and on promotional "gifts-with-purchase." *See* Tr. H. 7/9/96 at 8–14; Dx QQ, RR, SS, UU. The promotional gifts, however, have been distributed together with products bearing the full name PACO RABANNE, and included the characteristic monogram also appearing on the packaging of cosmetics and fragrances, including PACO RABANNE POUR HOMME. *See* Dx UU. The monogram consists of the lower case letter "r" appearing on the silhouette of a short-stemmed lower case letter "p." *See* Dx UU, K, L, M. Most of the advertisements also feature this monogram or the characteristic bottle of PACO RABANNE POUR HOMME. *See* Dx QQ, SS. The Court finds, therefore, that this evidence is insufficient to prove secondary meaning in the PACO mark alone.

The conclusion that the name PACO alone lacks secondary meaning is further supported by a series of market studies conducted by Paco Rabanne and its exclusive distributor in the United States, Compar Inc. *See* Tr. H. 7/9/96 at 35–36; Px 62. In the first study, conducted in 1991–92, Paco Rabanne commissioned a leading market research firm, Landor Associates, to conduct a worldwide study to identify the strengths and the weaknesses of the Paco Rabanne brand ("the Landor study," Px 87). *See* Tr. T. 6/23/98 at 266–67. In assessing Paco Rabanne's image worldwide, the Landor study concluded that Paco Rabanne had a "[s]ingle known product, whose image ... [was] losing ground"; that the company's clientele was "older"; and that "haute couture and readywear of

the designer [were] weakly known to the public at large." Px 87b at PR00011892. In assessing the United States market, the Landor Associates stressed that the brand's strength, if any, *was limited to one product,* Paco Rabanne's signature fragrance *PACO RABANNE POUR HOMME,* and that in the minds of the consumers, the brand existed only in perfumes. *See* Px 87c (emphasis added). In particular, the Landor Associates' report stated that in this country there was "very little awareness of the mark," "reduction of product line to one product [PACO RABANNE]," "incapacity of the mark to immediately penetrate markets other than perfume," and that the brand's image was "the most devalued" here of all countries studied. Px 87c at PR0011947. The findings of Landor study are consistent with the conclusions a qualitative market study commissioned indirectly by Landor in connection with its study. The KRC report, *see* Px 129, based on several focus group discussions conducted in 1991–92, states that "Paco Rabanne *as a designer* is not known nor recognized in the United States. He is the name of a fragrance, rather than of a real life figure. As such, any associations between the fragrance and fashion lines must be created from scratch." *See* Px 129 at 3; Tr. T. 10/1/98 at 372, 384–86.

The limitations of Paco Rabanne's trademark strength are evident from yet another study entitled "The Compar Marketing Overview," an internal report prepared by Compar in 1995–96 in developing a marketing plan for the new PACO fragrance line and, in part, assessing the market potential of a proposed PACO line of casual clothing with its usual upscale image. *See* Tr. H 7/9/96 at 41–43, Px 81. This study consisted of four focus group discussions with fragrance purchasers about Paco Rabanne's image, packaging, and advertising. *See* Tr. H. 7/9/96 at 36. The study concluded, in part, that "[t]he name

pendent evidence corroborating this assertion was produced at trial. Therefore, the Court

does not find this testimony to be persuasive and rejects it.

Paco might not have been associated with Paco Rabanne had the name Paco Rabanne not been written on the ads." Px 62 at COM0003933. The researchers also observed significant disparity between the image of Paco Rabanne's fragrance and the image that the name PACO alone conveyed to the participants. Whereas the participants generally perceived Paco Rabanne's fragrances as heavy and appropriate for older men, they perceived the name Paco as "simple," "youthful," and "catchy." Px 62 at COM0003932, COM0003933.[10] This disparity between the image communicated by the name PACO alone and the image of Paco Rabanne indicates that consumers do not associate the name with the company. Similarly, the Landor study, in assessing the strength of Paco Rabanne's brand in the United States, observed market penetration by the name PACO RABANNE only.[11] *See* Px 87c at PR0011929.

Based on these reports, the Court finds that although Paco Rabanne's trademark PACO RABANNE has acquired some secondary meaning in the fragrance market, this limited strength does not extend to the name PACO when used alone.[12] Accordingly, the Court concludes that this *Polaroid* factor does not favor Paco Rabanne and that although the trademark PACO RABANNE has acquired limited secondary meaning in the fragrance market, the trademark PACO, used without the word RABANNE, does not have secondary meaning with the consuming public.

**10.** The report also states that the "line is not special enough and the name not famous enough in the US, to be of any Public [sic] relation use. A tie in with the Paco fragrance might ensure us a bigger 'buzz' ". Px 2, 16, & 81 at 9.

**11.** The study prepared for Compar in 1996 also found no "awareness or image of Paco Rabanne—the man or the designer—in the U.S. among this target group" (men and women, ages 18–29). Px 62 at COM0003906

**12.** The Landor studies also indicate that even in the fragrance market, Paco Rabanne's

### 2. Similarity of the Contested Trademarks

In analyzing this factor, "the courts consider whether the similarity of the marks is likely to cause confusion among potential customers." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 394 (2d Cir.1995). The courts have held that trademarks should be compared in their entirety, because "juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar." *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir.1984). In analyzing the trademarks' similarity, the courts appraise the overall impression created by the trademarks, considering the context in which the trademarks appear and "the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir.1993); *see also Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 744–45 (2d Cir.1998) (finding similarly sounding map names "StreetSmart" and "Streetwise" not confusingly similar because of differences in logos, typefaces, the maps' folds, and the sizes and colors of the writing); *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 581–82 (2d Cir.1991) (upholding the finding that the names "New Choices Press" and "New Choices For The Best Years" were not confusingly similar based on distinctions in typeface, location of the designations on products, and words accompanying the words "New Choices").

trademark is not very strong. *See* Px 132e at PR20006971; Px 132d at PR20006917; Px 132b at PR20006784; Px 132c at PR2 0006890; Px 87c at PR0011947; Px 87c at PR0011929. Similarly, the Weiss survey, (discussed below, *see infra* Part I.B.5), commissioned by Paco Rabanne in order to measure actual confusion found that 65% of the surveyed fragrance purchasers were not aware of Paco Rabanne. *See* Px 156–1; Expert Report of Tibor Weiss dated June 7, 1996, at 2. The KRC report concludes that the "fragrance has, at best, an indistinct, slightly outdated image in the US." Px 129 at 3.

Although the contested trademarks in the present case both include the name PACO, the trademarks are not identical, and several distinguishing features further reduce the likelihood of confusion. The word PACO on Paco Rabanne's products is always accompanied by the word RABANNE. *See* Dx K, L, K, P. On all products except the new PACO fragrance, the words PACO and RABANNE appear in letters of equal size and prominence, and even the bottle of the new PACO fragrance features the full name PACO RABANNE below the name PACO. *See* Dx K, L, M. In contrast, on Paco Sport's clothing, the name PACO appears alone or in conjunction with the words JEANS, SPORT, and others. *See* Dx EEEE, FFFF, GGGG; *see also McGregor–Doniger,* 599 F.2d at 1134 ("The fact that a trademark is always used in conjunction with a company name may be considered by the trial court as bearing on the likelihood of confusion."). In addition, the companies use different typefaces. Except on the new PACO fragrance, Paco Rabanne consistently prints the name PACO RABANNE in broad, rounded, all lower case letters, with both words appearing on one line. *See* Dx K, L, M. This standard one-line inscription also appears on the new PACO fragrance, only in smaller letters and below the name PACO. *See* Dx P. In its instructions to licensees, Paco Rabanne insists on consistent use of this standard logotype and typeface. *See* Dx V. Paco Sport, on the other hand, uses a variety of logos, with the name PACO printed generally in capital letters and often more prominently than other words. *See* Dx HHH, DDD, OOO, EEEE, FFFF, GGGG. Finally, consumers see the trademarks in different contexts. Paco Rabanne places its trademark on simple and stylish perfume bottles and boxes, often below the characteristic monogram consisting of the lower case "r" inside the lower case "p." Dx K, L, M, P, SS.[13] Paco Sport's marks appear on casual clothing generally characterized by bright colors or embroidery, which Paco Rabanne's witnesses have described as "outrageous," "loud," and ethnic in orientation. Tr. H. 7/9/96 at 25, 50–51.

Because of these sharp distinctions in the trademarks, the products, logos, advertising, and market appeal between the contested trademarks, the Court finds that they are not confusingly similar. Accordingly, this *Polaroid* factor favors Paco Sport.

### 3. Competitive Proximity of the Products

Under this *Polaroid* factor, the courts examine "whether and to what extent the two products compete with each other," based on "the nature of the products themselves and the structure of the relevant market." *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 480 (2d Cir.1996).

In examining this factor, the courts compare all aspects of the products, including price, style, intended use, target clientele, typical distribution channels, and others. For example, in *McGregor–Doniger,* the Second Circuit upheld the finding of "significant" competitive distance between inexpensive golf jackets and expensive fashionable women's coats based on differences in the products' "appearance, style, function, fashion appeal, advertising orientation, and price." 599 F.2d at 1134–35; *see also Centaur Communications,* 830 F.2d at 1226 (finding that "different editorial emphasis" of two magazines, one being concerned with marketing news in America and the other with marketing news in Britain, "militates against a finding of proximity"), *H. Lubovsky,* 627 F.Supp. at 494 (analyzing similarity in price, style, and typical retail outlets in order to determine the competitive proximity between two women's shoes manufacturers).

In the present case, significant competitive distance exists between Paco Rabanne's fragrances and Paco Sport's casual clothing. Whereas Paco Sport markets its

---

**13.** Focus group participants have described the bottle of the new PACO fragrance as "unique, trendy, cool, high tech and 'classy.' " Px 62 at COM0003904.

clothing to young, urban males, Paco Rabanne markets its fragrances to high fashion-conscious and high income consumers. *See* Tr. H. 10/3/96 at 396, 402; Tr. T. 6/18/98 at 159–62; Tr. T. 10/1/98 at 372, 389; Tr. T. 6/23/98 at 207, 211–12, 342–43. While Paco Sport chooses inexpensive retail outlets in urban neighborhoods, Paco Rabanne sells its products through exclusive, upscale department and specialty stores. *See* Tr. H. 7/15/96 at 325; Tr. H. 7/9/96 at 60. Paco Sport's products are also significantly cheaper than Paco Rabanne's products. *See* Tr. H. 7/15/96 at 317; Tr. T. 6/23/98 at 207, 342. Furthermore, the products differ in their style and image. For example, Paco Rabanne's witnesses have emphasized Paco Sport's loud colors and "outrageous" designs, as well as the disparity between these clothes and Paco Rabanne's stylish upscale image. *See* Tr. H. 7/9/96 at 24–25, 32–33, 50; Tr. T. 6/23/98 at 342–43. These disparities in target clientele, style, image, and price also exist between Paco Rabanne's clothing and Paco Sport's products. *See* Tr. T 6/23/98 at 208, 250–53. Accordingly, there is a large competitive distance between the companies' clothing.

Paco Rabanne argues that it should prevail on this factor because clothing and fragrances are related products. *See* Def. Mem. at 9–10. This argument fails, however, because the analysis of proximity should focus on the specific attributes of the products in question rather than on broad product categories. *See McGregor-Doniger,* 599 F.2d at 1134–35. Paco Rabanne relies primarily on the Second Circuit's decision in *Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167 (2d Cir. 1976), in which the court concluded that a designer of women's scarves, apparel and linens was entitled to protection of her trademark from use on fragrances and cosmetics, in part, because the products were closely related. *Id.* at 1174. Contrary to Paco Rabanne's contention, however, the court in *Scarves by Vera* did not hold that fashion and fragrances were closely related as a matter of law. On the contrary, the court reached its conclusion by evaluating the particular facts of that case. Specifically, the court found that the plaintiff's designs and the defendant's fragrances were sold in the same stores, that the designer's trademark was strong, and that the recognition of the designer's trademark was equivalent to that of other fashion designers who had expanded into fragrances. *See id.* at 1174–75.

Paco Rabanne also relies on the evidence that many fashion designers market both jeans and fragrances under their names. Although this fact could favor the finding of proximity, *see Scarves by Vera,* 544 F.2d at 1174, it is outweighed by the significant differences between Paco Rabanne and Paco Sport's products. In addition, as discussed above, the evidence indicates that Paco Rabanne as a designer is not known in the United States. *See* Px 62 at COM0003906, COM0003932; Px 129 at 3; Px 132c at PR20006890.

Furthermore, the failure of Paco Rabanne and Compar to challenge Paco Sport's activities until 1995 supports the inference that Paco Rabanne itself did not consider Paco Sport and Paco Rabanne's markets as proximate. Since 1989, Paco Sport has been successfully selling its PACO clothing at industry trade shows and through catalogues, with sales rapidly growing from $3.5 million in 1989 to $27 million in 1995. *See* Tr. H. 10/3/96 at 396, 415–17, 437–39. The clothing was available in many stores in New York City, where Paco Rabanne also markets fragrances. *See* Tr. H. 7/9/96 at 60, 7/15/96 at 325. Paco Rabanne (generally, through Compar) consistently investigates and attempts to limit the sales of counterfeit fragrances and unauthorized importation, striving to protect its trademark in the fragrance market. *See* Tr. H. 7/9/96 at 26–27; Tr. T. 6/23/98 at 347–50; Dx OO. Nevertheless, Paco Rabanne did not become concerned about Paco Sport's activities until late 1995, despite Paco Sport's marketplace success. *See* Tr. H. 10/3/96 at

505, Tr. T. 6/23/98 at 243; Px 19, 55. In fact, the most probable conclusion to be drawn from Paco Rabanne's failure to exercise its usual diligence in monitoring for possible trademark infringements is that Paco Rabanne's management did not see Paco Sport as posing any threat of customer confusion. Indeed, Paco Rabanne did not even react to the discovery of the PACO shirts in 1993, when executives at Compar, presented with Paco Sport's shirts, treated them as a joke. *See* Tr. H. 7/9/96 at 24–25, 50–51; Tr. H. 10/3/96 at 504; Tr. T. 6/23/98 at 241–43.

For all of the aforementioned reasons, the Court finds that this factor favors Paco Sport.

### 4. Bridging the Gap

This *Polaroid* factor examines the likelihood that the senior user will enter the junior user's market and compete with the junior user ("bridge the gap"). *See Streetwise Maps*, 159 F.3d at 743. The factor weighs in the senior user's favor either if bridging the gap is actually probable or if an average consumer perceives it as probable. *See Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir.1996); *Lois Sportswear*, 799 F.2d at 874. The actual probability of bridging the gap is relevant because the trademark law protects, in part, the senior user's interest in being able to expand into a related field in the future. *See Hormel Foods*, 73 F.3d at 504. The perception of consumers, on the other hand, affects the likelihood of confusion, because if consumers perceive bridging the gap as probable, they are more likely to believe that the junior user's products emanate from the senior user. *See Lang*, 949 F.2d at 582, *McGregor–Doniger*, 599 F.2d at 1136 ("Because consumer confusion is the key, the assumptions of the typical consumer, whether or not they match reality, must be taken into account.").

In analyzing this factor, the courts have defined the junior user's market narrowly, using such parameters as price range, tar-

get clientele, and distribution channels. *See Gruner + Jahr*, 991 F.2d at 1078–79 (upholding a finding that a publisher of a monthly magazine on parenting (the senior user) was unlikely to bridge the gap by beginning to publish a quarterly compilation of articles on parenting (the junior user's product)); *Lois Sportswear*, 799 F.2d at 874 (analyzing the likelihood that a manufacturer of inexpensive popular jeans would bridge the gap by beginning to manufacture designer jeans); *H. Lubovsky*, 627 F.Supp. at 494 (finding no gap between two manufacturers of women's shoes because of similarities in price, style, and typical retail outlets).

Here, Paco Rabanne argues, first, that it has already bridged the gap because it has always marketed clothing. *See* Def.Mem. 10–11. This contention is without merit, however, because Paco Rabanne has never competed in the same market as Paco Sport. While Paco Sport markets inexpensive casual clothing for men and boys, targeting urban minority groups, *see* Tr. T. 6/18/98 at 156–62; Tr. H. 7/15/96 at 317, Tr. H. 10/3/96 at 396, 402, Paco Rabanne distributes a very small quantity of very expensive designer clothing, *see* Tr. T. 6/23/98 at 207–08; 250–53. In addition, Paco Rabanne markets its products in expensive, up-scale department stores, while Paco Sport does not. *See* Tr. H. 7/15/96 at 325; Tr. H 7/9/96 at 60, 176. Moreover, Paco Rabanne has presented no evidence of plans to market inexpensive casual clothing in direct competition with Paco Sport. Finally, Paco Rabanne's failure to monitor the casual clothing market and to discover Paco Sport's activities earlier, as discussed above, as well as its indifference to the discovery of the PACO shirts in 1993, shows that the company's management had no interest in that market, and was not planning to enter it. *See* Tr. H. 7/9/96 at 24–25, 50–51; Tr. H. 10/3/96 at 504; Tr. T. 6/23/98 at 241–43.

Second, Paco Rabanne argues that because fashion and fragrance industries are related, consumers seeing Paco Sport's

jeans are likely to assume that Paco Rabanne has entered the jeans market. *See* Def.Mem. at 11. In making this contention, Paco Rabanne relies on the testimony of three witnesses, Maria Politis, Verna De Gruttola, and Kenneth Pover, purporting to demonstrate instances of such confusion. *See* Def.Mem. at 12, Tr. H. 7/9/96 at 174–75, 177–79, 63–64, 84–86. Paco Rabanne also maintains that because many other designers market both jeans and fragrances under their names, consumers seeing Paco Sport's jeans are likely to assume that Paco Rabanne is doing the same. *See* Def.Mem. at 11.

The Court finds that the evidence does not support Paco Rabanne's position. First, contrary to Paco Rabanne's contention, the testimony of Politis, De Gruttola, and Pover does not establish the beliefs of a typical consumer. De Gruttola is an account coordinator for Compar, Paco Rabanne's exclusive distributor in the United States, and her work consists of promoting Paco Rabanne fragrances in department stores in the Boston area. *See* Tr. H. 7/9/96 at 82. Pover is Paco Rabanne's account manager at the agency handling Paco Rabanne's outdoor advertising. Tr. H. 7/9/96 at 61–62. De Gruttola and Pover both testified that, on seeing Paco Sport's jeans, they assumed that the jeans were a new product from Paco Rabanne. Tr. H. 7/9/96 at 84–86, 63–64. However, because of their professional association with Paco Rabanne both De Gruttola and Pover are more aware of Paco Rabanne's marks and more sensitive to them than an average consumer.[14] Accordingly, their reaction to Paco Sport's is not indicative of the typical consumer's reaction. *See Brown v. Quiniou*, 744 F.Supp. 463, 472 (S.D.N.Y.1990) (concluding that the impression of a fashion professional cannot reflect that of the average consumer). Politis, an associate at the law firm representing Paco Rabanne in this case, testified that a stock boy and a telephone operator at Macy's, a depart-

ment store selling Paco Rabanne fragrances, thought that Paco Rabanne had begun marketing jeans. *See* Tr. H 7/9/96 at 174–75, 177–79. As is the case with De Gruttola and Pover, however, these people were probably more aware of Paco Rabanne than a typical consumer. In addition, given the magnitude of the difference in marketing strategies referred to above, the Court does not find this testimony persuasive, especially since it lacks detail, and is both vague and self-serving in character.

For these reasons, the Court concludes that Paco Rabanne has failed to establish the likelihood of bridging the gap. Accordingly, this *Polaroid* factor does not favor Paco Rabanne.

### 5. Actual Confusion

This factor examines whether the allegedly similar trademarks have actually confused consumers in the marketplace. *See Centaur Communications*, 830 F.2d at 1227. Although evidence of actual confusion is not necessary to prevail on a trademark infringement claim, the courts have concluded that the absence of such evidence may favor the junior user. *See Streetwise Maps*, 159 F.3d at 745; *McGregor–Doniger*, 599 F.2d at 1136 ("[I]t is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion."). Evidence of actual confusion may consist of anecdotal or survey evidence. *See Centaur Communications*, 830 F.2d at 1227. In the present case, Paco Rabanne has presented both types of evidence purporting to show actual confusion. *See* Def. Mem. at 12–14. The Court finds, however, that the presented evidence fails to demonstrate actual confusion among relevant consumers.

### (a) Anecdotal Evidence of Actual Confusion

Paco Rabanne relies on the same testimony of its employees De Gruttola, Pover,

---

**14.** Ms. De Gruttola testified that she considered herself more aware of the Paco Rabanne

brand than a typical consumer. *See* Tr. H. 7/9/96 at 87.

and (its lawyer) Politis, that it used to support its argument on bridging the gap, as well as on the testimony of Mitchell Bierman, a Compar account supervisor, as evidence of actual confusion. *See* Def. Mem. 12; Tr. H. 7/9/96 at 75–76, 78–79. In sum and substance, these employees either erroneously assumed that Paco Sport clothing was affiliated with Paco Rabanne, or testified to overhearing other third parties being similarly confused. As discussed above, given their professional association with the plaintiff, Paco Rabanne's witnesses' testimony regarding their purported confusion does not demonstrate actual consumer confusion in the marketplace.[15] Furthermore, the witnesses' testimony that recounts certain third party confusion was textbook hearsay, and as such, is particularly unreliable since any probative value it has would be based upon an assumption that those statements truthfully reflect the beliefs of those workers, none of whom was available for cross-examination.

Paco Rabanne also relies on the alleged confusion of customs officers from the United Kingdom, *see* Dx MMM, PPP, QQQ, RRR, SSS, TTT, and of a denim manufacturer from France (who is also a personal friend of Paco Rabanne's president), *see* Tr. T. 6/23/98 at 244. The Court finds this evidence unpersuasive. First, these individuals have no knowledge of market conditions in the United States. Therefore, their beliefs have no relevance in ascertaining the confusion of American consumers, especially given the marked difference in Paco Rabanne's popularity in Europe and the United States. *See* Def. Mem. 13; Tr. H. 7/15/96 at 198–99; Px 87b PR0011887–90; Px 87c at PR0011928–29.

*(b) Survey Evidence of Actual Confusion*

In claiming actual confusion, Paco Rabanne also relies on the results of a mall-intercept survey conducted by market research specialist Tibor Weiss ("the Weiss survey"), purporting to show a confusion level of approximately 14.5% in the consuming public. *See* Def.Mem. at 13. The survey was conducted in twelve mid to upscale shopping malls in twelve different cities. *See* Expert Report of Tibor Weiss dated June 7, 1996 ("ERTW") at 2. Mr. Weiss defined the survey's universe as men and women of 18 and older who (1) had purchased men's or women's fragrance within the preceding twelve months and (2) had heard of the fragrance brand Paco Rabanne. *See* ERTW at 2.

Each interview consisted of two parts. During the first part ("screener"), an interviewer would inquire whether the respondent's age was eighteen or over and then read to the respondent a list of twelve types of products, including men's or women's fragrance, asking which of the them the respondent had purchased for himself or others within the preceding twelve months. The interviewers were instructed to terminate the interview if the respondent was younger than 18 or if the respondent had not purchased fragrances within the preceding twelve months. *See* ERTW Exhibit 4 (Dx HHHH). Otherwise, the interviewer would proceed to the second part of the interview ("main questionnaire"), during which the interviewer would show the respondent three pictures of PACO jeans (*see* ERTW Exhibits 1–3; Dx EEEE, FFFF, GGGG), and then ask whether the respondent believed that the company manufacturing the jeans made or sold other products (question 1). *See* ERTW Exhibit 4 (Dx HHHH). If the respondent answered "yes," the interviewer would ask what those other products were (question 2), why the respondent had named those particular products (question 3), and, if the respondent had mentioned fragrance but no specific brand, what the name of the fragrance was (question 4).

**15.** It is worth mentioning that although Paco Rabanne's witnesses presented numerous tales about persons not affiliated with Paco Rabanne incorrectly assuming that Paco Sport was somehow affiliated or sponsored by Paco Rabanne, Paco Rabanne failed to call a single disinterested witness to testify about incidents of actual confusion.

*See* ERTW Exhibit 4 (Dx HHHH). Next, the interviewer would ask whether the respondent thought that the company selling the jeans was "affiliated, associated or connected with any other company," and, if so, which company and why the respondent thought the affiliation existed (questions 5a–c). ERTW Exhibit 4 (Dx HHHH). The interviewer would then read a list of fourteen fragrance brands, including Paco Rabanne, asking the respondent to identify the brands he or she had heard of before (question 6). The interviewers were instructed to terminate the interview if the respondent had not heard of Paco Rabanne. *See* ERTW Exhibit 4 (Dx HHHH). Finally, the interviewer would record the respondent's age and sex (questions 7–8), and name, address and telephone number for validation purposes. *See* ERTW Exhibit 4.

Of the 553 fragrance purchasers of eighteen or older interviewed, only 193, or 35%, had heard of Paco Rabanne and thus belonged to Mr. Weiss's universe. *See* ERTW at 2; Px 156. Of these 193, twenty-eight, or 14.5%, mentioned Paco Rabanne or Paco and fragrances in answering questions 1–4. *See* ERTW at 3 & Exhibit 5; Px 156. The answers to question 5, regarding possible business affiliation, were never tabulated and did not influence the analysis. *See* Tr. H. 7/15/96 at 209; Affidavit of Tibor Weiss dated July 12, 1996, ("ATW") ¶ 25.

Paco Sport commissioned its own survey to evaluate consumer confusion. This survey, conducted by market research specialist Walter McCullough ("the McCullough survey"), used essentially the same questions as the Weiss survey, but differed from the Weiss survey in several respects. First, the McCullough survey did not exclude persons who were not fragrance purchasers. *See* Px 116 Exhibit B. Instead, at the end of the interview, an interviewer would read a list of types of products, including jeans and fragrances, and ask the respondent which of the products he purchased for himself or others. *See* Px 116 Exhibit B. The interview would be completed regardless of the answer, but the responses of jeans and fragrance purchasers were then tabulated both separately and together. *See* Px 116. Second, the McCullough survey did not exclude persons who had not heard of Paco Rabanne. *See* Px 116 Exhibit B. Third, the screener asked generally whether the respondents purchased the named goods instead of whether they had purchased the named goods within the preceding twelve months. *See* Px 116 Exhibit B. In addition, the McCullough survey used a larger sample (*see* Px 116 at 5), and included a control group of respondents who were asked the same questions as the test group but saw pictures of jeans of a different brand (PEPE rather than PACO) (*see* Px 116 at 6). Finally, Mr. McCullough tabulated the responses to the question about possible business affiliation, and counted as confused those respondents who mentioned Paco Rabanne. The McCullough survey shows that among either jeans or fragrance purchasers, the levels of confusion are negligibly low (below 5%) and virtually indistinguishable from levels of confusion in the control group. *See* Px 116 at 3, and tables 2/2 and 5/2 of Exhibit E.

Each party contends that its opponent's survey is fatally flawed because of an inappropriate universe. *See* Def.Mem. at 13–14, Plaintiff's Post–Trial Reply Memorandum of Law ("Pl.R.Mem.") at 12. Paco Rabanne argues that Mr. McCullough's universe is too broad because it includes persons unaware of Paco Rabanne. *See* Def.Mem. at 13–14. Paco Sport, on the other hand, argues that by improperly excluding fragrance purchasers unaware of Paco Rabanne, the Weiss survey artificially inflates the rate of consumer confusion. *See* Pl.R.Mem. at 12. Each party also attacks its opponent's survey on other grounds. Paco Rabanne relies on the expert report and testimony of Mr. Weiss criticizing the McCullough survey. *See* Def.Mem. at 14; Dx KKKK KKK; Tr. T. 6/23/98 at 321–31. Paco Sport relies on

the expert report and testimony of Dr. Donald E. Payne, a market research specialist, criticizing the design and administration of the Weiss survey. *See* Px 109, Tr. H. 7/15/96 at 234–314. The Court must evaluate these criticisms in order to determine the surveys' probative value. At the outset, however, the Court notes that the level of confusion that even the Weiss survey purports to show (approximately 14.5%) is low considering the narrow universe (past fragrance purchasers *aware of Paco Rabanne* ), and thus would not tip this *Polaroid* factor in· Paco Rabanne's favor regardless of the survey's merits.

### Survey Universe

The courts have held that to be probative on the issue of actual confusion, a survey must rely on responses of prospective purchasers of the products in question. *See Universal City Studios*, 746 F.2d at 118; *Conopco*, 49 F.Supp.2d at 253; *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1273 (S.D.N.Y. 1990) (reasoning that those who do not contemplate a purchase may be less aware of relevant·source-indicating distinctions). Because in most trademark infringement cases the senior user and the junior user sell competing products, the courts have rarely needed to address the question which market should be tested for actual confusion. In *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir.1994), the Second Circuit concluded that the proper universe depended on the type of confusion at issue. Where the senior user is concerned about the "traditional" type of confusion (*i.e.*, that the junior user is selling its products as if they come from the senior user),· the relevant market consists of the junior user's customers. In con-

trast, when the issue is whether consumers mistakenly believe that the senior user's products actually originate from the junior user ("reverse" confusion), the appropriate universe consists of the senior user's customers. *See id.; Hutchinson v. Essence Communications, Inc.*, 769 F.Supp. 541, 560 (S.D.N.Y.1991) (concluding that the relevant universe consisted of rap music consumers when the senior user ESSENCE magazine was attempting to prevent the junior user, a rap musician, from using the name Essence, because of the magazine's concern that consumers·would believe the magazine sponsored the performer). With these precedents in mind, the defects of the Weiss survey's universe become immediately apparent.

First, the universe was defined as persons who had purchased fragrances in the preceding twelve months rather than persons who intended to purchase fragrances in the future.[16] Thus, the survey improperly excluded prospective purchasers. *See Universal City Studios*, 746 F.2d at 118.

Second, the survey improperly focused on the fragrance market rather than on the jeans or casual clothing market. Paco Rabanne has repeatedly expressed its concern that consumers would mistakenly attribute Paco Sport's clothing to Paco Rabanne. *See* Tr. H. 7/9/96 at 32; Tr. T. 6/23/98 at 342–43. This is especially true since Paco Rabanne's antecdotal evidence purports to show traditional rather than reverse confusion (*i.e.*, that people mistakenly attribute Paco Sport's products to Paco Rabanne). Thus, traditional rather than reverse confusion is at issue. Accordingly, the relevant market is the purchasers of jeans or casual clothing, and not the purchasers of fragrances. *See Sterling Drug*, 14 F.3d at 741.[17] Thus, the Weiss

---

16. Mr. Weiss justifies his universe definition by asserting that "past behavior is the best predictor of future behavior." ATW ¶ 7. Paco Rabanne has presented no evidence, however, to show that this principle is applicable to the jeans or fragrance markets. *See Cumberland Packing Corp. v. Monsanto Co.*, 32 F.Supp.2d 561, 572 (E.D.N.Y.1999) (reasoning that past

users may be good proxies for future purchasers for some products, but rejecting, in the absence of any proof, this assertion in the case of sugar-substitutes).

17. Paco Sport also challenges that the Weiss survey incorrectly excluded fragrance purchasers who were *unaware* of Paco Rabanne.

survey's reliance on the confusion rate of Paco Rabanne's consumers further weakens its results.

In contrast to the Weiss survey, the McCullough survey's universe does not suffer from the flaws described above and is consistent with the established requirements. The screening process was based on current rather than past purchasing behavior; the survey encompassed jeans purchasers and the results in that market were separately tabulated; and the survey did not exclude persons unaware of Paco Rabanne.

*Other Criticisms of the Surveys*

Paco Sport relies on the expert report and testimony of Dr. Payne to point out other defects in the Weiss survey. *See* Px 109; Tr. H. 7/15/96 at 234–314. Of these criticisms, the strongest is the possibility of interviewer bias. The experts on both sides agree that for survey results to be reliable, interviewers should not be aware of the purposes of the survey, of the sponsor's identity, or of the answers the sponsor wants to receive. *See* ATW ¶ 28; Px 109 at 3. Interviewers occasionally fabricate answers instead of completing interviews, and knowledge of the desired responses makes cheating easier. *See* Dx JJJJJJ at 131. In contrast to the McCullough survey, where interviewers had to complete the interviews regardless of the respondents' answers, the interviewers in the Weiss survey were instructed to terminate the interviews if the respondents had not purchased fragrances or were not aware of Paco Rabanne. *See* Dx HHHH. Thus, the interviewers could have easily guessed that the survey focused on fragrances and on Paco Rabanne. *See* Px 109 at 3.

Dr. Payne also believes that the Weiss survey's results are unreliable because of insufficient validation. *See* Px 109 at 3–8. The purpose of validation is to identify the interviewers who had probably fabricated the answers instead of completing interviews in accordance with instructions. *See* Dx IIIIII at 504–05; Dx JJJJJJ at 133–34. In a proper validation procedure, a different person calls the respondent at the number recorded on the questionnaire to make sure that the respondent exists and that the interview was in fact conducted. *See* Px 109 at 4. If a significant part of any interviewer's questionnaires fail to validate, all the work of that interviewer must be discarded as untrustworthy. *See* ATW ¶ 23; Tr. H. 7/15/96 at 237, 243. Mr. Weiss believes that the validation of his survey was sufficient because ninety-five questionnaires were fully validated, constituting 49% of the 193 questionnaires in the universe. *See* ATW ¶ 33. Dr. Payne, however, believes that the actual validation percentage was significantly lower, because it should have been based on the total number of interviews completed, 553, rather than on the number of interviews ultimately selected as belonging to the universe. The reason for his opinion is that the validation process aims to identify the untrustworthy interviewers rather than to confirm specific respondent's answers. Furthermore, Dr. Payne has identified as unreliable several interviewers whose work Mr. Weiss did not discard. These interviewers either recorded suspiciously similar responses in a number of questionnaires or had an impermissibly high number of questionnaires failing to validate. *See* Px 109 at 5–8.

Dr. Payne's valid criticisms cast further doubt on the reliability of the Weiss survey's results. Accordingly, the Weiss sur-

---

See Pl.Mem. at 10. In response, Paco Rabanne contends that a person who is not aware of Paco Rabanne cannot be confused at all, and, therefore, is irrelevant to the actual confusion analysis. *See* Def.Mem. at 13. The Court finds Paco Rabanne's approach, limiting its universe to consumers aware of its products, inappropriate because even a weak

brand could demonstrate a high degree of confusion because of the limited nature of the universe being surveyed. The Court therefore agrees with Paco Sport's expert, Mr. McCullough, that the more appropriate practice is to survey all prospective purchasers. *See* Tr. T. 6/17/98 at 100–102.

vey's results must be further discounted as unreliable.

In contrast, Paco Rabanne's criticisms of the McCullough survey lack merit. For example, Mr. Weiss has expressed an opinion that some of the interviewers may have used the wrong set of pictures, confusing the test and control groups, but then admitted that his belief was only speculation. *See* Dx KKKKKKK at 4; Tr. T. 6/23/98 at 325–28. Similarly, there is no merit to the allegation that Paco Sport's attorneys exerted impermissibly extensive influence on the survey's design, especially considering that Mr. Weiss himself had cooperated with Paco Rabanne's attorneys in designing his survey. *See* Dx KKKKKKK at 2–3, 3–4; ATW ¶ 12; Tr. T. 6/23/98 at 326, 328–30.

*(C) Conclusion*

In summary, the court finds that Paco Rabanne has failed to present relevant and reliable evidence of actual confusion. As discussed above, the anecdotal evidence does not establish actual confusion in the marketplace. Furthermore, the Weiss survey is fatally flawed and not probative on the issue of actual confusion. Accordingly, Court concludes that this *Polaroid* factor favors Paco Sport.

*6. Junior User's Good Faith*

This factor examines whether the junior user "adopted its mark with the intention of capitalizing on [the senior user's] reputation and goodwill and any confusion between his and the senior user's product." *Sports Auth.*, 89 F.3d at 964 (quoting *Lang*, 949 F.2d at 583). Knowledge of the senior user's mark, while relevant to this

determination, "does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Arrow Fastener*, 59 F.3d at 397. Selection of a mark that reflects the product's characteristics or attracts customers, on the other hand, indicates good faith. *See Streetwise Maps*, 159 F.3d at 746. Additional relevant factors may include a request for a trademark search, reliance on the advice of counsel, *see Lang*, 949 F.2d at 583, and the benefits the junior user could derive from consumer confusion. *See Hormel Foods*, 73 F.3d at 505.

Paco Rabanne alleges that Paco Sport adopted and used the mark PACO in bad faith. *See* Def.Mem. at 14–16; Def. R.Mem. at 9–10. The evidence, however, does not support this contention. Paco Sport's president Mr. Jebara testified that he did not know of Paco Rabanne when he chose the mark. *See* Tr. H. 10/3/96 at 399. The Court finds this testimony credible particularly because Paco Rabanne primarily markets fragrances to high income, status and fashion-conscious consumers, while Mr. Jebara has been working in the urban minority market since his arrival in the United States from Syria in 1971. *See* Tr. H. 10/3/96 at 388, 390; 393–94; Tr. T. 6/23/98 at 207–08, 211–12; Tr. T. 10/1/98 at 372, 389.[18] The difference between Paco Rabanne and Paco Sport's images and target markets also indicates that Paco Sport had nothing to gain from creating confusion among customers or from an association between its products and Paco Rabanne.[19] Moreover, Mr. Jebara testified that he had selected the mark PACO in order to attract his ethnic customers, "Paco" being a common Hispanic nick-

---

18. In addition, Ms. Cohen, Paco Sport's advertiser, testified that there was no mention of Paco Rabanne or of its designer image during her discussions of Paco Sport's advertising campaign with Mr. Jebara. *See* Tr. H. 7/15/96 at 323.

19. As previously noted, the 1996 report summarizing the results of focus group discussions about Paco Rabanne concluded that young consumers associated the name with a

strong, heavy fragrance for middle-aged men. *See* Px 62 at COM0003904. Mr. Jebara testified that when his company attempted to use the mark LePaco, Paco Sport's customers rejected the mark because they did not "want to be bothered" with a French name and because the mark was not sufficiently simple for Paco Sport's market. Tr. H. 10/3/96 at 398–99, 468–69.

name. *See* Tr. H. 10/3/96 at 396. This explanation, which the Court finds reasonable and credible, further supports the inference that Paco Sport did not adopt the mark PACO in order to create confusion or to trade off of Paco Rabanne's goodwill. *See Streetwise Maps,* 159 F.3d at 746 (holding that junior user's choice of mark with the twin goals of describing and promoting its product supported the finding of the junior user's good faith).

Paco Rabanne correctly points out that Paco Sport did not produce any evidence of having conducted a trademark search prior to adopting the mark PACO. *See* Def.Mem. at 15, Tr. H. 10/3/96 at 465, 477–78. Failure to do a trademark search, however, is not in itself sufficient to establish bad faith. *See Streetwise Maps,* 159 F.3d at 746 ("Defendants' failure to perform an official trademark search, even with the knowledge that plaintiff marketed its maps under the Streetwise name, [did] not standing alone prove that they acted in bad faith [in adopting the mark StreetSmart for their maps]."). Paco Rabanne also claims that the registrations of its marks put Paco Sport on constructive notice of. Paco Rabanne's marks. *See* Def. Mem. at 14. The Court rejects this argument, however, because Paco Rabanne's registration in the clothing category was for the mark PACO RABANNE rather than PACO, and the registration for the mark PACO was solely in the fragrances and cosmetics category. *See* Answer & Counterclaim at 4–5; Dx A–H.

Therefore, existence of these registrations is not sufficient to establish that Paco Sport adopted its mark for clothing in bad faith. *See Arrow Fastener,* 59 F.3d at 398 ("[T]he fact that the registration of [plaintiff's] mark extended only to hand-operated staplers, not pneumatic staplers [sold by defendant], lends further support to the district court's conclusion that [defendant] did not act in bad faith."); *H. Lubovsky,* 627 F.Supp. at 495 (holding that plaintiff's trademark registration for shoes was irrelevant to the question of the defendant's intent in using a similar mark on clothes, even though the registration indicated the defendant's bad faith in using the mark on shoes).

In addition, Paco Rabanne points out that Paco Sport continued to use the trademark PACO even after the Patent and Trademark Office declined to register the mark because it was confusingly similar to the previously registered mark PaCo owned by a manufacturer of women's hosiery. *See* Def.Mem. at 15, Tr. H. 10/3/96 at 396–97, 402–03, Dx YYY, ZZZ, CCCC. Knowledge of the third party registration, however, does not demonstrate that Paco Sport was aware of *Paco Rabanne's* marks or was trying to trade on *Paco Rabanne's* goodwill.

The remaining evidence presented by Paco Rabanne to support its allegation of bad faith is irrelevant to this *Polaroid* factor. The use of trademark registration symbol, the letter "R" in a circle, or of the words "Designed in Italy" on some of Paco Sport's labels (*see* Def.Mem. at 15–16, Tr. H. 10/3/96 at 469–73; Dx BB, CC, DD) sheds no light on Paco Sport's intent in choosing the mark PACO in 1989. Similarly irrelevant is Paco Sport's 1996 decision, after consulting with the company's attorney, to-use the slogan "It's in the Jeans" despite some doubts about third party rights to this slogan. *See* Def.Mem. at 15; Tr. T. 6/23/98 307–11, 314–15; Dx MMMMMMM, NNNNNNN, OOOOOOO, PPPPPPP, ZZZZZZZ.

For these reasons, the Court finds that Paco Sport adopted the mark PACO in good faith. This Polaroid factor, therefore, does not favor Paco Rabanne.

*7. Quality of Junior User's Products*

The courts have held that the quality of the junior user's products can be relevant to trademark infringement analysis in two ways. First, inferior quality of the junior user's products increases the senior user's interest in preventing confusion, because associations with an inferior product tar-

326

nish the senior user's reputation. *See Hormel Foods,* 73 F.3d at 505. Second, differences in the products' quality may affect the likelihood of confusion. *See id.* The courts have found that, when the senior and the junior users' products are otherwise similar, comparable quality may support the consumers' belief that the products emanate from the same source and thus contribute to consumer confusion. *See Morningside Group Limited v. Morningside Capital Group,* 182 F.3d 133, 142 (2d Cir.1999) (finding that comparable quality of plaintiff's and defendant's similar financial services increased the likelihood of confusion); *Banff Ltd. v. Federated Dep't Stores,* 841 F.2d 486, 492 (2d Cir.1988) (reasoning that similar quality of plaintiff's and defendant's directly competing clothing increased the likelihood of confusion). A marked difference in quality, on the other hand, may reduce the likelihood of confusion. *See Plus Prods. v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1006 (2d Cir.1983) ("[M]arked difference between the quality of plaintiff's and defendants' noncompeting goods reduces ... the likelihood of confusion."). The Second Circuit has also held that similarity in quality is unlikely to contribute to confusion when the products are otherwise dissimilar. *See Hormel Foods,* 73 F.3d at 505 ("[S]imilarity of quality as between SPAM [luncheon meat] and Spa'am [merchandise featuring a puppet character from the movie "Muppet Treasure Island"] is unlikely to cause confusion, because the products are not otherwise related as to makeup, usage, etc."); *Arrow Fastener,* 59 F.3d at 398 (finding that the similar quality of plaintiff's hand-held stapler and defendant's pneumatic stapler did not increase confusion because the products differed in function, appearance, and price).

In the present case, Paco Rabanne has failed to produce any evidence indicating that Paco Sport's clothing is of poor quality. On the contrary, Paco Sport's success

in the marketplace (*see* Tr. H. 10/3/96 at 437–38) supports the inference that the clothing is of high quality for its market. *See H. Lubovsky,* 627 F.Supp. at 489–490 (sales success indicates good quality of the product). In addition, Mr. Jebara, Paco Sport's president, testified to the extensive quality control procedures used by his company. *See* Tr. H. 10/3/96 at 412–15.

Nevertheless, Paco Rabanne attempts to take advantage of both aspects of this *Polaroid* factor, focusing on the disparity of style and image between the two companies' products rather than the products' quality. Paco Rabanne argues that Paco Sport's clothing includes a few "subtle and understated" pieces, but is generally "garish," featuring oversized logos or very bright colors and "pander[ing] to the latest discount-store fad." Def.Mem. at 17–18. Paco Rabanne contends that the few better models increase the likelihood of confusion, while the "garishness" of the rest of the clothing damages Paco Rabanne's carefully crafted upscale image. *See* Def. Mem. at 17–18. In response, Paco Sport argues that this *Polaroid* factor is neutral to the present case because of the wide disparity between the parties' products and target markets. *See* Pl.Mem. at 21.

The Court agrees that the quality of the competing products has little relevance to the issue of likelihood of confusion in this case. In view of the wide disparity between the products themselves and the market to which they are directed, the Court concludes that this factor is at best neutral.[20]

### 8. Sophistication of Consumers

This factor examines the sophistication of typical consumers and the level of care they exercise when purchasing the products at issue. *See Sports Auth.,* 89 F.3d at 965. Because people generally exercise greater care in purchasing expensive products than in purchasing cheap products, purchasers of expensive products are usu-

---

**20.** *See Plus Prods.,* 722 F.2d at 1006–07 (reasoning that dissimilar target markets and dissimilar goods lessen the likelihood of confusion).

ally less likely to be confused. *See McGregor–Doniger*, 599 F.2d at 1137; *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1561 (S.D.N.Y.1987). In the past, the courts have found purchasers of jeans to be careful and sophisticated. *See Lois Sportswear*, 799 F.2d at 875. Likewise, purchasers of expensive perfumes have generally been found to be sophisticated. *See Conopco*, 49 F.Supp.2d at 257; *Edison Bros. Stores*, 651 F.Supp. at 1562; *Nina Ricci, S.A.R.L. v. Gemcraft Ltd.*, 612 F.Supp. 1520, 1529 (S.D.N.Y.1985).

Usually, greater sophistication of consumers reduces the likelihood of confusion. *See Centaur Communications*, 830 F.2d at 1228. In some cases, however, greater sophistication may increase the likelihood of confusion. For example, in *Centaur Communications*, the Second Circuit suggested that greater sophistication could increase the likelihood of confusion if the products or the marks in question were identical. *Id.* at 1228 (holding that in that case, greater sophistication of the consumers "decreased the likelihood of confusion since neither the products nor the marks [were] identical").

In the present case, Paco Sport and Paco Rabanne agree that the relevant consumers are brand-conscious and sophisticated. Paco Sport argues that this factor weighs against the finding of likelihood of confusion. *See* Pl.Mem. at 21; Tr. T. 12/18/98 at 24. Paco Rabanne, on the other hand, argues that the consumers' sophistication increases the likelihood of confusion, because fashion-conscious consumers are more likely to assume that Paco Rabanne has joined the "legions" of other designers marketing both jeans and fragrances under their names. *See* Def. Mem. at 16; Tr. T. 12/18/98 at 65–66. In making this contention, Paco Rabanne again relies on the testimony of the "sophisticated" fragrance industry insiders, Pover, Bierman, and De Gruttola, who, upon seeing Paco Sport's advertising or jeans, thought that the jeans were a new product from Paco Rabanne. *See* Def. Mem. at 16–17; Tr. T. 12/18/98 at 65–66.

As discussed above, the Court is not persuaded by these arguments because: (1) the evidence shows that consumers in the United States are not aware of Paco Rabanne as a designer, and associate the name solely with the fragrance (*see* Px 129 at 3; Tr. T. 10/1/98 at 384–86; Px 62 at COM0003906, COM0003932); (2) although consumers may be likely to expect a fashion company to expand into fragrances, there is no evidence that they are likely to expect a fragrance company to expand into fashion (*see Sports Auth.*, 89 F.3d at 963, Tr. T. 6/23/98 at 215–16, 265, Px 130 at 4); and (3) the witnesses' reactions do not reflect the reactions of an average consumer, because the witnesses' association with Paco Rabanne heightens their sensitivity to the brand. In addition, the present case is clearly distinguishable from *Lois Sportswear*, because, as discussed above, Paco Rabanne and Paco Sport's products are competitively distant.

For these reasons, the Court concludes that the relevant consumers in the present case are sophisticated, and that their sophistication militates against the finding of likelihood of confusion because consumers knowledgable of both brands would conclude that the products are so different from one another that they do not emanate from the same source.

### 9. Weighing the Factors: Likelihood of Confusion

The Court finds that all eight *Polaroid* factors favor Paco Sport:

1. The strength of Paco Rabanne's trademarks is not sufficient to contribute to consumer confusion;

2. The contested trademarks are not confusingly similar;

3. The competitive distance between the products is significant;

4. There is no actual or perceived likelihood that Paco Rabanne will bridge the gap;

5. There is no evidence of actual confusion;

6. Paco Sport adopted its trademark in good faith;

7. The quality of Paco Sport's products is good for its market, but the factor is at best neutral to the issue of likelihood of confusion;

8. The sophistication of relevant consumers further reduces the likelihood of confusion.

Accordingly, the Court finds that Paco Rabanne has failed to prove likelihood of confusion and that its trademark claims must be accordingly rejected.

## II. COMMON LAW UNFAIR COMPETITION CLAIM

 "The essence of an unfair competition claim under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of goods.'" *Horn's, Inc. v. Sanofi Beaute, Inc.*, 963 F.Supp. 318, 328 (S.D.N.Y.1997) (quoting *Computer Assocs. Int'l. Inc. v. Computer Automation. Inc.*, 678 F.Supp. 424, 429 (S.D.N.Y.1987)). In order to prevail on a claim of unfair competition under New York law, a person must prove likelihood of confusion. *See Bristol–Myers Squibb*, 973 F.2d at 1048. The courts have also held that bad faith is an essential element of a claim of unfair competition. *See Brown*, 744 F.Supp. at 473. As discussed above, Paco Rabanne has failed to prove likelihood of confusion between its products and Paco Sport's clothing. *See supra* Part I.B. Furthermore, the Court has already found that Paco Sport adopted the trademark PACO in good faith. *See supra* Part I.B.6. Accordingly, Paco Sport cannot prevail on its common law claim of unfair competition.

## III. NEW YORK ANTI–DILUTION STATUTE CLAIM

 Paco Rabanne asserts a counterclaim of trademark dilution under section 360–1 (formerly 368–d) of New York General Business Law ("the statute"). The statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y.Gen.Bus.Law § 360–1 (McKinney Cum.Supp.1999). In *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 542, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977), the New York Court of Appeals concluded that the statute was designed to prevent "the whittling away of an established trade-mark's selling power and value through its unauthorized use by others upon dissimilar products." 42 N.Y.2d at 542, 399 N.Y.S.2d 628, 369 N.E.2d 1162. To prevail on a trademark dilution claim under the statute, a person must prove two elements: (1) ownership of a distinctive mark and (2) likelihood of dilution in the form of either blurring or tarnishment. *See Hormel Foods*, 73 F.3d at 506. Although the statute expressly dispenses with the requirement of likelihood of confusion, the courts have held that dilution is not possible without "some mental association between ... [the] marks." *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir.1989).

### A. OWNERSHIP OF A DISTINCTIVE TRADEMARK

In *Allied Maintenance*, the New York Court of Appeals stated that the statute protected only those trademarks that were "truly of *distinctive* quality or ... [had] acquired a secondary meaning in the mind of the public." 42 N.Y.2d at 546, 399 N.Y.S.2d 628, 369 N.E.2d 1162. The Second Circuit subsequently interpreted the statute as protecting "only extremely

strong marks." *Bristol–Myers Squibb,* 973 F.2d at 1049 (quoting *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983)). The courts have held that "distinctiveness in the antidilution realm may be evaluated in much the same way as strength of the mark is evaluated in the area of likelihood of confusion." *P.F. Cosmetique, S.A. v. Minnetonka Inc.,* 605 F.Supp. 662, 672 (S.D.N.Y.1985). In the context of analyzing Paco Rabanne's Lanham Act claims, the Court has already found that Paco Rabanne's trademarks PACO and PACO RABANNE are descriptive and therefore inherently weak; that only the trademark PACO RABANNE has acquired secondary meaning in the marketplace; and that the trademark's strength is limited and confined entirely to the fragrance market. *See supra* Part I.B.1.

## B. LIKELIHOOD OF DILUTION

Dilution can occur in the forms of tarnishment or blurring. *See Sports Auth.,* 89 F.3d at 966. Paco Rabanne argues that Paco Sport's use of the trademark PACO has both blurred and tarnished Paco Rabanne's trademarks. The Court finds that the evidence does not support these contentions.

### 1. Tarnishment

Tarnishment occurs when the senior user's trademark suffers negative associations because of the junior user's market activities. *See Hormel Foods,* 73 F.3d at 507. The senior trademark may be tarnished when the "trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2d Cir. 1994). For example, the courts have found tarnishment when "a distinctive mark is depicted in a context of sexual activity, obscenity, or illegal activity." *Id.* at 44. As discussed above, Paco Rabanne has presented no evidence to show that

Paco Sport sells clothing of shoddy quality, and Paco Sport's sales success indicates that the clothing's quality is good for its market. *See supra* Part I.B.7. Furthermore, Paco Rabanne does not allege that Paco Sport has depicted its PACO trademark in the context of sexual activity, obscenity, or illegal activity. Instead, Paco Rabanne bases its allegation of tarnishment on the disparity between the youthful urban style of Paco Sport's sportswear and Paco Rabanne's carefully crafted upscale image. *See* Pl.Mem. at 21. Although the Court finds that the disparity between the parties' images is indeed great, Paco Rabanne's distaste for Paco Sport's designs is not sufficient to show tarnishment. In addition, the Court is constrained to conclude that consumers are unlikely to associate Paco Sport's clothing with Paco Rabanne because of the significant competitive distance between the companies' products (*see supra* Part I.B.3), the sophistication of the relevant purchasers (*see supra* Part I.B.8), and the source-identifying distinctions between the trademarks themselves (*see supra* Part I.B.2).

### 2. Blurring

■ Blurring occurs when the senior user's trademark loses some of its power to serve as a unique identifier of the senior user's goods or services, because the public begins to associate the designation with another source. *See Sports Auth.,* 89 F.3d at 966. In evaluating the likelihood of blurring, the courts in this Circuit have applied the six-factor test outlined in Judge Sweet's concurring opinion in *Mead Data,* 875 F.2d at 1035. These factors are: (1) similarity of the trademarks; (2) similarity of the products; (3) sophistication of consumers; (4) predatory intent; (5) renown of the senior mark; and (6) renown of the junior mark. *See id.* The first five factors trace closely analogous *Polaroid* factors analyzed in evaluating Paco Rabanne's Lanham Act claims.

The Court has already described the parties' arguments and evaluated the relevant evidence in detail. *See supra* Part

I.B. First, although the contested trademarks both include the name PACO, the trademarks also include source-identifying distinctions sufficient to prevent consumer confusion. *See supra* Part I.B.2. The Court finds that these distinctions are also sufficient to preclude the consumers from making the requisite mental association between the trademarks leading to blurring. Second, the products are competitively distant and extremely dissimilar in their style, image, and customer appeal. *See supra* Part I.B.3. Third, the parties agree that their customers are sophisticated purchasers, and the Court has already found that the sophistication in this case will lead the purchasers to recognize that Paco Sport and Paco Rabanne's products emanate from two different sources. *See supra* Part I.B.8. Fourth, the Court has found that Paco Sport did not intend to capitalize on Paco Rabanne's goodwill and adopted the trademark PACO in good faith. *See supra* Part I.B.6. Fifth, the evidence showing the limited strength of Paco Rabanne's trademarks also demonstrates that the trademarks enjoy only limited fame in the United States, and that their fame is limited to the fragrance market. *See supra* Part I.B.1.

The only factor without a counterpart among the *Polaroid* factors is the renown of the junior trademark. Judge Sweet describes this factor as addressing the possibility that

> a junior mark may become so famous that it will overwhelm the senior mark. Dilution under this theory might occur where the senior user's advertising and marketing have established certain associations for its product among a particular consumer group, but the junior mark's subsequent renown causes the senior user's consumers to draw the associations identified with the junior user's mark.

*Mead Data,* 875 F.2d at 1038 (Sweet, J., concurring). In the present case, the parties did not present evidence showing specifically the degree of Paco Sport's trademark's popularity. The rapid growth of the company's sales (*see* Tr. H. 10/3/96 at 437–39) could support the inference that the trademark is well-known in the targeted urban minority market. Nothing in the evidence, however, indicates that Paco Sport's popularity extends into the upscale, fashion-conscious group of Paco Rabanne's customers. On the contrary, the wide disparity between the companies' distribution channels, images, styles, and target markets makes awareness of Paco Sport's products in this group unlikely. Even if Paco Rabanne's customers do notice Paco Sport's products or advertising, they are unlikely to associate the bright urban sportswear with Paco Rabanne's upscale fragrance. Furthermore, as discussed above, Paco Rabanne has not demonstrated that any of its customers have made an association between Paco Sport and Paco Rabanne. Accordingly, Paco Rabanne has failed to prove that the renown of Paco Sport's trademark is likely to blur the distinctiveness of Paco Rabanne's trademarks.

In summary, Paco Rabanne's dilution claim under the statute fails because Paco Rabanne's trademarks enjoy only limited strength in the marketplace. Moreover, even if the trademarks were sufficiently strong to meet the statutory requirements, Paco Rabanne would not be entitled to relief under the statute because the evidence does not support Paco Rabanne's claims of blurring or tarnishment.

### CONCLUSION

For all of the foregoing reasons, the Court grants Paco Sport's request for a declaratory judgment, holding that Paco Sport did not infringe upon Paco Rabanne's trademark rights. The Court also denies Paco Rabanne's request for a permanent injunction and other relief. The Clerk of Court is directed to enter judgment accordingly, and to close the above-captioned action

It is **SO ORDERED.**